12 A.3d 728 (2011)
418 N.J. Super. 177
STATE of New Jersey, Plaintiff-Respondent,
v.
Boyce SINGLETON, Jr., Defendant-Appellant.
No. A-1782-08T4.
Superior Court of New Jersey, Appellate Division.
Argued December 8, 2010.
Decided February 28, 2011.
*730 John Douard, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Douard, of counsel and on the brief).
Frank J. Ducoat, Deputy Attorney General, argued the cause for respondent (Paula T. Dow, Attorney General, attorney; Mr. Ducoat, of counsel and on the brief).
Before Judges CUFF, FISHER and SAPP-PETERSON.
The opinion of the court was delivered by
FISHER, J.A.D.
Defendant is presently serving a fifty-year prison term for murdering his pregnant girlfriend. At trial, he did not dispute shooting and stabbing the victim to death but instead asserted an insanity defense. He now argues the trial judge's instructions on the insanity defense were incomplete. Because defendant's testimony and other evidence supported his contention that he acted in accordance with a deific command, we reverse and remand for a new trial due to the judge's failure to give the amplified instruction required by State v. Worlock, 117 N.J. 596, 569 A.2d 1314 (1990), and State v. Winder, 200 N.J. 231, 979 A.2d 312 (2009).

I
The evidence revealed that, on September 13, 2005, defendant shot his pregnant girlfriend, Michelle Cazan, four times. Michelle did not immediately die from these wounds. She was choking on her own blood when defendant stabbed her four times with a butterfly knife. The knife wounds proved fatal.
Defendant had been living in Michelle's home in Mansfield since July 27, 2005; they commenced a dating relationship about a week after defendant moved in. On September 12, 2005, the day before her death, Michelle told defendant she was pregnant with his child.
The next day, September 13, 2005the day Michelle was killeddefendant went to Air Force and Army recruiting centers in Pennsylvania to discuss enlistment. Later that afternoon, he drove Michelle's car to Trenton to pick her up from her place of employment. Unknown to defendant, Michelle had scheduled an appointment for him to meet with her former co-workers about potential job openings. Defendant *731 and Michelle, however, began to argue instead.
As defendant later recounted to police, he was in a "terrible" mood. He was not interested in enlisting but was conscious of his need to provide for his child. Defendant asked Michelle to drive him to his brother's house in nearby Morrisville, Pennsylvania. During their argument, which continued on the ride to Morrisville, defendant said he saw Michelle "[a]s a prostitute"meaning "she was prostituting herself to another God"and exclaimed he "didn't trust her [and he] didn't want to be around her . . . [or] with her anymore." Michelle stopped the car and the two conversed for about forty-five minutes. Later, instead of continuing to Morrisville, they decided to drive north.
Defendant and Michelle eventually arrived in her hometown of East Rutherford, where she pointed out some of the local sites. Defendant became "enraged" by stories Michelle told about mob activity in the town. To defendant, Michelle "was bragging about" mob killings, which "defeat[ed] the purpose of the type of people who [they] were trying to become." At this point, defendant said he decided not to join the military: "I was not going to serve any other God but my God and I was going to have the courage and the strength to do what he was calling me to do."
The couple left East Rutherford, and continued arguing on the way to Mansfield. Defendant later told police he questioned "what we was gonna do for our future cause for the baby, how was it gonna work out, how, how it was gonna work, you know, how, how could it work, how could this work, how could that work and then like you know this is hell." He further described his feelings at the time as being void of "emotion, it was no love or, I didn't know love, I didn't feel nothing." At trial, defendant testified that Michelle was concerned for the unborn child and how it would be cared for, but "in [defendant's] eyes, that was just a lack of faith because [defendant] knew in [him]self that God will provide whatever [they] needed."
They arrived at Michelle's home around 10:30 p.m. Upon entering, defendant asked Michelle for the car keys. When she refused, defendant drew a revolver from his waistband and shot Michelle as she walked toward him. She screamed his name and began choking on her own blood. Because defendant "didn't want her to die like that. . . [and] didn't want her to suffer," he stabbed her with a butterfly knife. Defendant put the knife back in his pocket, left the revolver, and ran out of the home.
Defendant immediately drove Michelle's car to his friend William Britt's house in Trenton, where he washed his hands and changed his clothes. Defendant drank and smoked marijuana with William, who described defendant as "antsy" and "all over the place" during their few hours together. William's brother John Britt testified that defendant seemed "somewhat frantic . . . [k]ind of like he was scared" but also "confused."
Defendant left Britt's home and started walking to his parents' Morrisville home. On the way, he threw the knife into a canal in Trenton. Defendant told police he "planned on running" and "just keep kill[ing] everybody . . . until [he] got killed." He also said he discarded the knife because "that's what [he] was supposed to do, . . . cause from watching movie[s]. . . they tell you to get rid of the murder weapon."
Defendant arrived in Morrisville in the early morning hours of September 14. Defendant's sister, Lakeisha Singleton, arrived home at the same time. She testified that defendant approached the home *732 with a "numb" expression on his face and appeared "lost." Defendant asked Lakeisha for a ride to Michelle's house, and she agreed.
When they arrived at Michelle's house, defendant directed his sister to park in the rear of the building and, after determining that no one was there, defendant instructed Lakeisha to park in front. At trial, defendant explained that the police were his enemy and if he was captured, he could not serve God. He went inside Michelle's home, retrieved the revolver, and "cleaned up the place a little bit" by wiping down the door handles and steps to clean the "blood from everywhere." Defendant placed the revolver and items used to clean the residence in a plastic garbage bag.
Defendant returned to Lakeisha's car with the plastic bag and asked her to drive to Trenton so he could retrieve Michelle's car. Lakeisha testified that defendant had "many rambling conversations" during the ride but not with her: "Whoever he was talking to or whatever he was hearing, he was responding to. But the conversation wasn't for me." Defendant recalled Lakeisha asking what was wrong; he eventually confessed he had killed Michelle. Lakeisha suggested they drive to their parents' home, rather than stopping to retrieve Michelle's car.
Upon returning to Morrisville, defendant told his father he had killed Michelle. He also called a cousin in North Carolina to say he would be heading there. Defendant then left his parents' home and returned to Trenton to get Michelle's car.
During his drive south on Interstate 95, defendant spoke on the phone with his mother and Lakeisha. He cried during these conversations and said he wanted to hold Michelle. Defendant got as far as Baltimore before he decided to turn around and return to Morrisville.
Defendant arrived at his parents' home sometime after sunrise and informed his family he wanted to turn himself in but first wanted to "go hold [Michelle and] go see her." Defendant drove to Michelle's house with his brother, Damon. Lakeisha and defendant's mother followed in another car. Defendant first stopped at William Britt's home to retrieve his bloody clothes and to tell the Britt brothers he planned on turning himself in. Damon testified that defendant was "incoherent" during the car ride, that defendant "was talking to somebody" other than Damon.
When they arrived at Michelle's house, defendant went inside while the others remained outside. He entered Michelle's bedroom, repositioned her clothing, touched her elbow, and sprayed perfume on a stuffed animal, which he placed by her body. Damon eventually entered out of concern defendant might hurt himself and observed defendant holding Michelle's body in his arms "trying to wake her [and] telling her [to] wake up." Outside, defendant's mother asked a neighbor to call police.
After arriving at Michelle's home around 10:30 a.m., Mansfield Patrolman Jason Abadia immediately called for back-up, and Patrolman Donald Mathews arrived a few minutes later. Abadia positioned himself with a shotgun at the front while Mathews secured the rear of the residence. Abadia heard a man screaming from inside, a scream that eventually became more audible. The garage door then "flew open" and defendant exited. Defendant complied with Abadia's order that he "get down," and Mathews checked for weapons and handcuffed him. Abadia testified that defendant said:
I killed her. I killed her. Don't leave her like that. Cover her up. I killed her.
*733 Defendant was then placed in the back of a patrol vehicle.
Abadia testified that, after being read his Miranda[1] rights, defendant stated he killed Michelle by shooting and stabbing her. Defendant told the officer the gun was in the car and that he had thrown the knife in the canal. Abadia testified defendant was rocking about and crying.
The officers secured the scene and responsibility for further investigation was transferred to the New Jersey State Police, whose Detective Sergeant Lindsey Cooper arrived at Michelle's residence around 11:40 a.m. After assessing the scene, Cooper decided to seek a recorded statement from defendant and read defendant his Miranda rights. Defendant again admitted killing Michelle. He also stated that he saw a vision of Michelle in the window of her home as he was giving the statement. When asked why he was so angry, defendant stated: "Well, it's that damn book, that damn book, that damn book, man, it's that damn book, it's that damn book." He explained he was referring to the Bible and that: "I lost it and the devil kept fucking with me, he just kept fucking with me and I lost it. . . ." Defendant was asked if anyone else had been involved in the killing; defendant replied: "No, the devil, god and the devil (inaudible) inside of me, outside of me, all over the place, all over the place."
Defendant was transported to the stationhouse where Cooper again advised defendant of his Miranda rights and conducted an unrecorded nearly two-hour pre-interview, following which defendant provided a second taped statement. He was then taken to Trenton to recover the knife; it was never found.

II
Defendant was charged and, at the conclusion of a ten-day trial, convicted of first-degree murder, N.J.S.A. 2C:11-3a(1) and -3a(2); second-degree possession of a weapon (a handgun) for an unlawful purpose, N.J.S.A. 2C:39-4a; third-degree possession of a weapon (a knife) for an unlawful purpose, N.J.S.A. 2C:39-4d; third-degree unlawful possession of a weapon (handgun), N.J.S.A. 2C:39-5b; third-degree hindering apprehension, N.J.S.A. 2C:29-3b(1); and fourth-degree tampering with physical evidence, N.J.S.A. 2C:28-6(1).
Defendant moved for a new trial, claiming, among other things, the judge's insanity defense instructions were erroneous. The motion was denied.
At sentencing, after merging some of the weapons convictions into the murder conviction, the judge imposed a fifty-year prison term with an 85% period of parole ineligibility, pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2, on the murder conviction. The judge also imposed: a five-year prison term on the conviction for unlawful possession of a weapon, concurrent to the term imposed on the murder conviction; a five-year prison term on the hindering conviction, consecutive to the term imposed on the murder conviction; and an eighteen-month term on the tampering conviction, concurrent to the term imposed on the hindering conviction.
In appealing, defendant raises the following arguments:
I. THE COURT'S INSANITY DEFENSE JURY INSTRUCTION FAILED TO DISTINGUISH BETWEEN KNOWING AN ACT IS LEGALLY WRONG AND KNOWING IT IS MORALLY WRONG, AS REQUIRED BY STATE v. WORLOCK *734 AND STATE v. WINDER, THEREBY DEPRIVING DEFENDANT OF DUE PROCESS OF LAW AND THE RIGHT TO A FAIR TRIAL. U.S. CONST. AMENDS. VI, XIV; N.J. CONST. ART. I, ¶¶ 1, 9, 10.
II. BECAUSE THERE WAS EVIDENCE THAT MR. SINGLETON DID NOT ACT KNOWINGLY OR PURPOSELY DURING THE OFFENSES, THE ABSENCE OF AN INSTRUCTION ON DIMINISHED CAPACITY REQUIRES REVERSAL OF HIS CONVICTIONS AND A NEW TRIAL (Partially raised below).
III. REPEATED INSTANCES OF PROSECUTORIAL MISCONDUCT DENIED TO MR. SINGLETON HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL. U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST. ART. I, ¶¶ 1, 10.
IV. THE ADMISSION OF GRUESOME PHOTOGRAPHS OF THE DECEDENT DEPRIVED DEFENDANT OF THE RIGHT TO A FAIR TRIAL. U.S. CONST. AMEND. VI, XIV; N.J. CONST. ART. 1, ¶¶ 1, 10.
V. THE IMPOSITION OF A FIFTY-YEAR TERM FOR MURDER WITH 85% PAROLE INELIGIBILITY, AND A CONSECUTIVE TERM FOR THE RELATED OFFENSE OF HINDERING APPREHENSION, WERE MANIFESTLY EXCESSIVE.
Because we agree with the argument in Point I that a new trial is required due to the judge's failure to provide additional instructions to the jury on defendant's insanity defense, we need not reach the arguments contained in the remaining points.[2]

III

A
In instructing the jury on defendant's insanity defense, the judge generally explained the law's view of insanity and the allocation of the burden of persuasion. Defendant does not question the accuracy of those instructions or the judge's following instruction, based on the Model Jury Charge (Criminal), "Insanity" (2011), which defines insanity in terms of legal wrong:
to establish insanity as a defense to the criminal charge in this case, the defendant must prove by a preponderance of the evidence that he was laboring under such a defect of reason from disease of the mind, as not to know the nature and quality of the act, or if the defendant did know it, that he did not know that what he was doing was wrong.
Defendant argued instead, for the first time in his motion for a new trial and now here in this appeal, that the concept of insanity contained in the judge's charge was insufficient because his actions were produced by a "deific command," and consequently, the jury should have been instructed as required in that circumstance by Worlock, supra, 117 N.J. 596, 569 A.2d 1314, and Winder, supra, 200 N.J. 231, 979 A.2d 312. Although defendant has not presented the specific instruction in question, we assume the amplified instruction now urged would have advised the jury that if it were to find defendant had a delusion of a command from God and acted pursuant to that commandeven though *735 he understood the act was legally wrong the jury could find him insane. See, e.g., People v. Schmidt, 216 N.Y. 324, 110 N.E. 945, 946 (1915).

B
Our Legislature has defined the insanity defense in the following way:
A person is not criminally responsible for conduct if at the time of such conduct he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong.
[N.J.S.A. 2C:4-1.]
So defined, the insanity defense comports with the fundamental purposes of our criminal law system to ensure public safety. Worlock, supra, 117 N.J. at 601, 569 A.2d 1314. That is, criminal punishment serves to deter the defendant in choosing wrong over right, but "[i]f the defendant cannot understand the wrongfulness of his or her conduct, he or she will not understand the reason for the punishment, and that punishment will not serve as a deterrent to anyone." Id. at 601-02, 569 A.2d 1314.
The test for insanity, as codified by N.J.S.A. 2C:4-1, is based on the M'Naghten[3] Rule. Id. at 602-06, 569 A.2d 1314. The M'Naghten Rule, however, does not define the term "wrong," and as a result, there has been much debate in jurisdictions that also apply this insanity test as to its meaning. Id. at 606-11, 569 A.2d 1314. The Court addressed this in Worlock, recognizing that "[i]n most instances, legal wrong is coextensive with moral wrong," because the "[l]aw is largely the crystallization of societal morals." Id. at 610, 569 A.2d 1314. Thus, in most cases, "if the defendant was capable of understanding that he was acting contrary to law, he would also have sufficient capacity to understand that he was acting contrary to the morals of society." Id. at 609-10, 569 A.2d 1314.
The Worlock Court further explained that the "`right and wrong' test does not focus on the actual knowledge of the defendant, but rather on his ability to perceive the wrongfulness of his conduct." Id. at 610, 569 A.2d 1314 (emphasis added). If, at the time of the crime, the accused lacked the capacity to distinguish right from wrong, he or she will be excused from criminal liability. Ibid. Importantly, because the focus is on the defendant's "ability to comprehend whether his or her actions would ordinarily be disapproved by society, the concept of moral wrong must be judged by the societal standards, not the personal standard of the individual defendant." Ibid. It follows that, "[a]s a general rule, it will not be sufficient . . . that a defendant's personal moral code justified a killing otherwise prohibited by law and societal morals." Ibid.
Given the facts before it, the Worlock Court rejected the defendant's claim to a more particularized insanity instruction. Id. at 614-15, 569 A.2d 1314. There, the defendant had killed two of his friends, after one had stolen his wallet, which contained a scandalous photograph of the defendant. Id. at 599-600, 569 A.2d 1314. At the time of the murders, the defendant admitted he knew his actions were both illegal and against the morals of society. Id. at 614, 569 A.2d 1314. Nevertheless, he justified the killings under his own personal code of morality. Ibid. The Court determined that the "[b]elief in an idiosyncratic code of morality does not constitute the defense of criminal insanity," otherwise *736 "the life of each member of society would be imperilled by the whims of every other member." Ibid.
The Worlock Court, however, did recognize the "exceptional case" in which a defendant claims to have acted "under a command from God." Id. at 611, 569 A.2d 1314. In such circumstances, the jury must be instructed that "wrong" includes both legal wrong and moral wrong. Ibid. Although the facts of Worlock did not evoke this deific exception, the Court hypothesized: "if the defendant contends that he or she knowingly killed another in obedience to a command from God, a jury could find that the defendant was insane." Ibid.
This concept was again addressed in Winder, supra, 200 N.J. at 242-51, 979 A.2d 312.[4] There, the defendant shot and killed a cabdriver at point blank range, and claimed insanity. Id. at 235, 979 A.2d 312. He asserted "a belief that his parents were trying to kill him" and that, at the time of the murder, he knew it was legally wrong but claimed he did not know it was morally wrong. Ibid. Citing Worlock, defense counsel sought a jury instruction that distinguished between legal and moral wrong. Id. at 240, 979 A.2d 312. The trial judge denied the request, noting that the facts presented a case where legal and moral wrong were coextensive. Ibid.
After examining the principles set forth in Worlock, and the "rare instance in which legal and moral wrong are not coextensive," id. at 248, 979 A.2d 312, the Court concluded that the defendant did "not assert that his delusion commanded him to kill the cabdriver or that it would not be wrong to kill." Id. at 249, 979 A.2d 312. In fact, the defendant "demonstrated knowledge of the social unacceptance of his deed both by apologizing to his victim at the time of his anti-social act, and by consciously excluding children and his parents from his potential victims." Ibid. Consequently, the Court explained "[t]his case does not present the type of command-type delusion that renders its hearer incapable of any appreciation of what society deems right from wrong." Ibid.
Thus, in two cases, Worlock and Winder, the Court recognized the possibility of cases in which an insanity defense will require further definition of insanity beyond the actor's understanding of what is legally wrong, but found the facts before it did not justify such a charge. In addition, the Winder Court recognized the "exceptional" nature of deific-command delusions, 200 N.J. at 249-50, 979 A.2d 312, and cited a few examples. See Diestel v. Hines, 506 F.3d 1249, 1272 (10th Cir.2007) (observing that a defendant could be found legally insane if "mental illness caused him to believe that he had a warrant from the President or a command from God to kill the victim"), cert. denied, 553 U.S. 1079, 128 S.Ct. 2875, 171 L.Ed.2d 812 (2008); People v. Serravo, 823 P.2d 128, 140 (Colo. 1992) (determining that the insanity defense may be established where "the defendant's cognitive ability to distinguish right from wrong with respect to the act has been destroyed as a result of a psychotic delusion that God has decreed the act"); State v. Cameron, 100 Wash.2d 520, 674 P.2d 650, 653-54 (1983) (recognizing the need for amplification beyond the "right and wrong" instruction where the defendant claimed to have killed under the command of God).
*737 In considering the deific-command situation further, the Winder Court provided this additional clarification:

Worlock's dicta on delusional commands allowed for a specific distinction between legal and moral wrong in only the clearest and narrowest category of cases where a delusional command could be objectively recognized to confound the difference between lawful behavior and a moral imperative. Hence, courts have identified few examples as fitting the narrow class of cases contemplated. . . . Worlock's holding demonstrates that cases involving only an idiosyncratic, subjective sense that an action is morally correct do not constitute exceptions to the generally coextensive nature of legal and moral wrong in society so as to support being excused from criminal responsibility.
[Winder, supra, 200 N.J. at 251, 979 A.2d 312.]
To summarize, then, the deific command category is narrow, and the facts of Worlock and Winder failed to fit that category. Notwithstanding, those cases recognize that at times insanity may be established even when the defendant knows his or her act is legally wrong if acting under the compulsion of a command from God. An example provided in Schmidt is instructive:
A mother kills her infant child to whom she has been devotedly attached. She knows the nature and quality of the act; she knows that the law condemns it; but she is inspired by an insane delusion that God has appeared to her and ordained the sacrifice.
[110 N.E. at 949.]
As Judge Cardozo explained for the court in Schmidt, "[i]t seems a mockery to say that, within the meaning of the statute, she knows that the act is wrong," concluding that "nothing either in the history of the rule, or in its reason and purpose, or in judicial exposition of its meaning," could "justify a conclusion so abhorrent" as to hold the mother legally responsible for the crime. Ibid.

C
The scope of the category in question has been established by Worlock and Winder; further amplification of the meaning of insanity is required only in "the clearest and narrowest category" in which the accused claims to have acted on a deific or presidential command. Winder, supra, 200 N.J. at 251, 979 A.2d 312.[5] Our role is limited to considering whether the evidence permitted a finding by the jury that defendant acted pursuant to a deific command. If so, then the additional amplified definition of insanity was required. We, therefore, turn to the evidence offered in support of defendant's insanity defense, which we explore at some length.
Lakeisha testified first. She recalled defendant was once "[e]nergetic [and] happy," but in his early to mid-twenties, "[h]e just started acting different sometimes." Defendant had attended college but eventually dropped out and moved home. According to Lakeisha, their family was very religious and, after leaving college, defendant devoted a significant amount of time to studying the Bible. He grew his hair long, stopped shaving, and wrote scriptures on walls.
Defendant told Lakeisha he was a Levite, a first-born son, and as such, his family should support and care for him. She *738 testified defendant developed strong beliefs in the separation of church and state, and concluded that the words "In God We Trust" rendered money evil.
Lakeisha testified that sometime in July 2005, a few months prior to Michelle's murder, defendant inquired about mental health treatment. On the same occasion, he told Lakeisha he had been hearing voices that told him to kill his family because they were sinners. She testified: "my brother looked at me and said to me, if I didn't love you so much, you would have already been dead, because the voices told me to kill all of you because you're sinning."
Tamika Farris spent a lot of time with the Singleton family, and similarly described changes in defendant after he came home from college, explaining defendant was "very . . . adamant and fervent about the Bible and reading the Bible . . . almost to a point of consumption." Tamika recalled defendant entering a phase where he wanted to be like people from the Bible, grow his hair long, and live off the earth without money. Tamika also described defendant's strong views on money and the separation of church and state.
In recounting the July 2005 incident described by Lakeisha, Tamika remembered Lakeisha was visiting her home when defendant stopped by "seem[ing] really distraught, really upset, [and] really worried." Tamika and Lakeisha asked defendant what was bothering him, and he replied: "I keep hearing these voices." Defendant explained: "God speaks to me [and] tells me that I have a job to do." Tamika said defendant either referred to himself as a "warrior" or a "soldier" and said that God had sent him "to eradicate all the evil people [and] eliminate all the sinners." Defendant further told Tamika and Lakeisha that he had a list of people whom God had given him to "take out." Defendant then looked to his sister and Tamika and said: "you need to be glad that I love you so much, because you two are also on my list." At this point, Tamika offered to help him seek treatment, but defendant left.
Defendant's mother, Mary, also testified. Like the other witnesses, Mary described defendant as "fun-loving" and popular growing up. She noticed changes in defendant around junior high school. He "shutdown" in some respects, no longer interested in schoolwork and believing "everybody was against him." Defendant participated in a school walk-out, as a response to an incident involving a teacher and defendant's brother Damon, resulting in his suspension from the football team. As a result, defendant "just ran" to an uncle's house in New York "for quite some time," and became more disrespectful and angry by the end of high school.
Mary then testified about defendant's brief college experience. After being placed on academic probation a few times, defendant eventually left school and moved home. Defendant was "moping around," and Mary suggested he "get into the Bible [and] just start reading the word." Defendant "would shut himself in and just stay in the house and just read. . . . [H]e would just be in his bedroom for days, just stay in the house, weeks, just in there just committed to God." Defendant "tried to just turn away from sin completely. And, so he was putting people out of his life, his friends, his brothers, hiseverybody." Mary became concerned with defendant's interpretation of the Bible and tried to persuade him to become affiliated with a church study group or to talk with other religious family members.
Mary explained that defendant's studies focused on the Old Testament, and that he was troubled by the separation of church and state, recounting defendant's belief *739 that money was evil because it stated "In God We Trust." He told his mother that there were two Jesuses in the Bible and her church was teaching incorrect principles. Defendant also told his mother he was a "soldier for God" with a responsibility "to let man know that [they] weren't living according to the way that God wanted [them] to live." His appearance changed and, for a while, defendant stopped working so he would not have to deal with money. Mary testified that defendant viewed himself as a Levite and that his family owed him a "tithe," meaning one-tenth of their earnings, to support him so he could build a home and live in the woods.
Mary also testified about defendant's "communications" with God. In 2003, defendant's sister Shakia was taking medication to control her frequent seizures. Defendant informed his mother that God told him Shakia should stop taking her medication so God could heal her. Shakia continued with the medication and eventually became paralyzed from the waist down for several weeks, which prompted defendant to reiterate that God had told him Shakia should have stopped taking her medicine.
Mary described another incident in May or June of 2005 when defendant demonstrated aggression toward a homosexual. Shakia had become a minister and was counseling the young man because his mother had just passed away. Defendant directed that the man leave the home, calling him a sinner. This "transition" in defendant, which Mary described as "just look[ing] like there was somebody there that it wasn't him," alarmed Mary and Shakia, and they immediately left the house. Mary expressed that she "felt threatened, afraid, because that was not [her son], and [she] didn't want to go back in the house with him in there." Defendant left Mary's home as a result of that incident and, soon thereafter, moved in with Michelle.
Mary also testified regarding the events in her home after Michelle's murder. She recalled that defendant "was standing in the bathroom, and he was looking at himself in his mirror and he kept looking at his hands and flipping them back and forth and looking at himself." After defendant left the house, Mary said "we were just sitting there, just quietso after a while the Lord spoke to me and said call your son, and so I said and what am I gonna say to him." She continued: "And so I'm having a conversation back and forth with God, and he said just call him. So then I prayed, and I asked God to tell me what to say . . . to help us get through this."
When Mary called defendant, he was in Michelle's car. Defendant was crying and told his mother: "I didn't mean to hurt [Michelle], I'm sorry, I didn't mean to hurt her." Defendant said he wished he had another bullet so he could kill himself. Eventually, Mary convinced defendant to return, surrender to the police, and "get right with God." As defendant proceeded home, Mary kept calling him. Each time, defendant repeated he was sorry and that he did not mean to hurt Michelle. Mary also testified defendant appeared to be having other conversations when they were on the phone: "I couldn't understand. It's like he was talking to God."
Defendant's brother Damon was also present in the early morning hours following Michelle's murder. Like other witnesses, Damon remembered defendant as a positive person; "he was the best possible brother you could ask for," recalling the walk-out in high school and the sacrifice defendant made to support him during that time. Damon also noticed the changes in defendant once he returned home from college: "[i]t just seemed like *740 he had the weight of the world on his shoulders." Damon described defendant's transformation in becoming a Levite, including "days" he would spend in his bedroom studying the Bible. Defendant asked Damon for help in reading some of the passages from the Old Testament. Damon thought that "what I was reading was not what he was interpreting, and we'd sit and discuss it, and it was not evenit wasn't even in the same ball park, the things that I read." He could not understand defendant's interpretation of the Bible. At one point, Damon thought that perhaps defendant "should go see someone, to talk to someone." Damon became concerned because the things "God was saying to [defendant] w[ere] not something that [Damon] would think [his] God or anybody's God would say," and thought some of defendant's values and beliefs demonstrated aggression.
Damon also testified about the morning of September 14, 2005, when he found out defendant had killed Michelle. When Damon arrived at his parents' house, defendant had already headed south in Michelle's car. When defendant returned, Damon said he was "a wreck," crying and mumbling. However, when they drove to Michelle's home, defendant "drove perfect[ly]" and took his time. Damon tried to talk to his brother during the ride, but defendant was "incoherent" and talking to someone else.
In her testimony, defendant's sister Shakia recalled inviting defendant to a Bible study class at her home. Defendant "would get frustrated, because they didn't want to hear what he had to say," and eventually members of the class stopped attending. Shakia testified that "my brother and I had very different understandings of the Bible, and at some point we just stopped talking about it." Her testimony corroborated some of the circumstances testified to by others.
Defendant's aunt, Melissa Panniel, also testified. Much of her testimony supported that of other family members regarding changes in defendant's appearance, demeanor, and beliefs. She recalled studying the Bible with defendant and feeling as if he was taking it "too literal." For example, Melissa tried to help him understand there was no longer a need for sacrifices as in Biblical times.
Defendant testified on his own behalf. He detailed the tribulations of his life up until 2003 when he decided to actively turn to the Bible. After his unsuccessful college experience, defendant moved into his mother's home but did not remain long given his mother's strict views on women, drinking, smoking, and music in the home. From there, defendant moved around.
A girlfriend in Trenton became pregnant with defendant's first child. Operating under the mistaken belief she had an abortion, defendant moved to California to be with another woman, who became pregnant and gave birth to defendant's second child. Defendant testified at length about his troubled relationship with his California girlfriend, including a domestic violence incident. Defendant also described when he learned his Trenton girlfriend had not had an abortion, and his efforts to secure visitation rights and a resulting altercation.
In 2003, realizing he needed a more disciplined life, defendant began reading the Bible. Defendant explained his Bible studies, including his following of the Old Testament and his belief in two Jesuses, by reading different passages to the court. Defendant admitted other people did not understand his interpretations, so he stopped going to church.
*741 Defendant discussed the laws of the Old Testament. When asked for his interpretation of "thou shalt not kill," defendant stated:
I understand it to mean that thou shalt not kill as far as breaking the law. A killing or a murder is an unlawful killing. Now, there's times where it's warranted by law to kill, so I understand, that is thou shall not kill if I tell you not to kill or it's not warranted. You just can't go and kill for any reason just because you see fit and you want to kill. No, if I tell you it's okay to kill, then it's okay, but other than that, thou shalt not murder or thou shalt not kill.
Defendant explained that if "God tells you to kill[,] [t]hen you're supposed to kill. If you don't kill, it's actually a sin not to." For example, "[y]ou can be put to death for idolatry[,] . . . for homosexuality[,] . . . for working on a Saturday[,] [and] for adultery. There's quite a few things that you can be put to death for in the Old Testament." Relying on another Bible passage, defendant justified the killing of family members or any other person "who tries to get you to follow the God other than the God that II worship."
Defendant also testified at trial about his relationship with God. When asked whether he "actually spoke with God," he responded:
Yes. Yes. . . . I can'tcan Ican I say I actually spoke with God or God spoke with me as far as His Spirit isit's kind of complicated to get into. But His Spiritthat His Spirit ministered to me and that I received like aa talk from Him, yes. Not, per se, did I hear His His voice, specifically.
In describing the incident with Shakia's seizure medication, defendant explained he had been sleeping on the floor with the Bible after "studying real heavy." He fell asleep and "felt like a presence come over [him] . . . and it was like pray for [his] sister . . . and tell her to stop taking medication." The next morning, defendant woke up, prayed for Shakia, and told her God wanted her to stop taking her medication. Defendant described feeling "happy" in this moment, for God had chosen him to do his work.
Thereafter, defendant changed his lifestyle. He testified about his beliefs regarding money and the separation of church and state. He recalled not paying a fine while on probation because it did not accord with his Levite beliefs.
Defendant testified about the July 2005 incident, when Shakia was counseling the homosexual man in his mother's home. He remembered: "I was upstairs in bed, once again, like asleep, and I guess I stayed between sleep and, like, not sleep, but I guess in between. I can't really describe that state." He continued: "I believed that I heard something say to me go downstairs and kill him because he was homosexual." Defendant admitted to "wrestling" with the idea but thought there might be "consequences" if he did not go downstairs. He could not recall his exact words when entering the room, but he remembered telling Shakia "she would suffer the same fate that he would suffer" if she sided with her friend, meaning defendant would also "put her to death."
Defendant discussed a visit he had with Tamika and Lakeisha regarding his beliefs and experiences. He had been thinking about his relationship with Michelle and their Bible studies together, but he believed he was being hypocritical by not practicing what he was preaching. On the day defendant visited Tamika and his sister, he walked away from his job and decided he "had to follow God and . . . knew he needed to get a gun." When asked why he needed the gun to serve God, defendant explained: "For different *742 things that people were doing that were wrong, they would be put to death." Defendant also stated he was "skeptical" of Michelle, thinking she may be an FBI agent or that she may have somehow attributed to Shakia's seizures.
Defendant nevertheless ended up moving in with Michelle and became intimate with her. In recounting the events of September 13, 2005, defendant testified Michelle was upset when he arrived late to pick her up. Once in the car, defendant wrestled with the idea of joining the military but determined he "wasn't going to go because [he] was not going to take a life for a God other than [his] God." He further told Michelle she "was prostituting herself to another God" just like everybody else. Moreover, after Michelle took defendant to her hometown and pointed out the location of a "mob hit," defendant knew "[s]he had already had her mind made up that she was going to serve the God that was in In God We Trust, and [defendant] had [his] mind made up that [he] was not going to serve that God." Defendant explained their argument had nothing to do with their unborn child; in fact, he described being "happy" about it because he planned on having a family and moving into the woods.
Before they arrived at Michelle's home, she stopped to make a few purchases. Her use of money confirmed to defendant that they were already "divided" and Michelle was going to work for Satan. When they arrived home, defendant said he shot Michelle "[b]ecause she was trying to get [him] to worship a God other than [his] God, and follow a God other than [his] God." Defendant stated: "It was the right thing because it was something God was telling me to do." He continued to stab her "[b]ecause [he] heard Michelle choke" and he loved her. At the same time, he knew he had to serve God, and was "happy" that he had the courage to serve him.
When asked what defendant next planned on doing, he responded:
[I]t all depend[ed] on thisthe individual that I came upon. If an individual did not understand who God was and didn't understand what I believed, then I wouldn't have just, I guess, randomly killed him or did anything to him, I would probably tried to teach him how strongly it was that I believed and if they was trying to get me to do anything other than that, then, yeah, I probably would have killed that person.
Defendant then described leaving Michelle's home and going to see the Britt brothers. He was "planning on seeing if [John] was ready to go and do the things that [they] were supposed to do be doing because [John] had an understanding of what it was that [defendant] believed." Defendant further stated that asking John for money was a test; John lending money to defendant signified he did not want to serve the same God as defendant. Defendant testified he "was going to kill him," but failed to do so because he left the gun at Michelle's home and the knife was a poor choice of weapon.
Defendant testified that many of his actions after killing Michelle were to buy more time so he could acquire more ammunition to "fight the police" and continue to "serve God." He pondered going to Mexico to purchase ammunition because the money there did not say "In God We Trust." However, while driving south, he heard a song on the radio that reminded him of Michelle and signaled she had forgiven him.
Defense expert Dr. Maureen Santina, a clinical and forensic psychologist, testified defendant suffered from schizoaffective disorder of the bipolar type, "[w]hich means he has the symptoms of schizophrenia *743 and the symptoms of bipolar disorder." Dr. Santina considered comments made by defendant's family and friends during interviews, and determined defendant's delusions had been progressing for years prior to Michelle's death. She concluded that defendant "was not capable of recognizing that what he did was wrong [b]ut in fact, he believed that he was right. He believed that he was being compelled to do this by God and that therefore he had to obey that belief."
Dr. Santina concluded with her opinion that defendant met the test for legal insanity. First, she classified her diagnosis as "one of the most severe and one of the most debilitating" mental diseases. Next, Dr. Santina opined that defendant knew he was killing Michelle but did not understand the nature of what he was doing. In other words, he believed "he was supposed to kill her because God was ordering it." She then testified that defendant "was not capable of recognizing that what he did was wrong[,] [b]ut in fact, he believed that he was right. He believed that he was being compelled to do this by God and that therefore he had to obey that belief."
The State's expert, Dr. Elliot Atkins, also a clinical and forensic psychologist, agreed with Dr. Santina that defendant suffered from schizoaffective disorder and that defendant operated under a delusional system in which he believed he needed to serve God. However, Dr. Atkins opined these delusions did not trigger Michelle's murder. Rather, in Dr. Atkins's view, defendant had a history of aggressive behavior towards women, he and Michelle had a "strained relationship," and "[t]here was a tremendous amount of conflict and tension" on the day of the murder. Dr. Atkins concluded that defendant knew "the nature and quality of his actions," and "that his intention was to kill the decedent," which defendant "knew . . . was wrong."

D
Defendant contends he provided substantial evidence that, as a result of mental illness, he sincerely believed he received a deific command to kill, which required the amplified instruction regarding moral wrong. The State, on the other hand, argues defendant failed to present facts that would necessitate such a clarifying instruction, contending defendant did not kill Michelle pursuant to a deific command but instead operated under his own idiosyncratic interpretation of the Bible.
If the State's interpretation was all that was before the jury, we would agree this case would not fit the narrow class described by the Winder Court and conclude that the additional instruction sought by defendant was not necessary. Acting on a faulty Bible interpretation rather than a deific command would not meet the Winder majority's requirements for the amplified instruction.
But that was only one interpretation of the evidence. Defendant testified that killing Michelle "was the right thing because it was something God was telling me to do"that he was acting pursuant to God's commandand his expert agreed that defendant "believed that he was being compelled to do this by God and that therefore he had to obey that belief." Whether or to what extent the State was able to call into question the persuasiveness of this evidence is not determinative of the content of the judge's charge. It was for the jury to find the facts and determine whether defendant believed God commanded him to kill Michelle.
And it was for the judge to provide instructions depending upon how the jury might find the facts. "When . . . *744 divergent factual versions give rise to different theories . . ., the trial court should provide the jury with appropriate instructions, depending on which version it chooses to accept." State v. Martin, 119 N.J. 2, 16-17, 573 A.2d 1359 (1990); see also Mathews v. United States, 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54, 66 (1988); State v. Echols, 199 N.J. 344, 363, 972 A.2d 1091 (2009); State v. Sloane, 111 N.J. 293, 303, 544 A.2d 826 (1988). Indeed, the Court has counseled that jury instructions on an alternative defense theory should be given even when that theory is supported only by "[v]ery slight evidence." State v. Powell, 84 N.J. 305, 317, 419 A.2d 406 (1980); see also State v. Moultrie, 357 N.J.Super. 547, 556, 816 A.2d 180 (App.Div.2003).
Here, defendant provided his own testimony and the testimony of others to support his contention that he was commanded by God to kill Michelle. He also supported this theory with testimony from an expert. Defendant's evidence in support of his claim of a deific command is not "slight." And, although the State offered evidence to rebut this, it was not for the trial judge to choose one version over the other in crafting a jury charge. Defendant was entitled to have the jury instructed on his theory of the case and the failure to provide amplification of his insanity defense was erroneous.
To be clear, there was nothing erroneous about the charge as far as it went. The trial judge properly utilized the model charge in describing the basic meaning of insanity. In a case such as this, the jury should be instructed that an insanity defense may be established by evidence that the defendant "was laboring under such a defect of reason from disease of the mind, as not to know the nature and quality of the act, or if the defendant did know it, that he did not know that what he was doing was wrong." Model Jury Charge (Criminal), "Insanity" (2011). The trial judge gave this instruction; the error was in the failure to provide additional instructions.
That is, as we have observed, the record contained evidence from which the jury could have found that defendant believed he had received a deific command to murder Michelle. With only the model jury charge as a guide, the jury could have rejected the insanity defenseeven if it found persuasive the deific-command evidenceby finding defendant understood his actions were contrary to law. To avoid that possibility, a judge must provide not only the model charge but also the further explanation that insanity may be found even if defendant knew his actions were contrary to lawif he proved by a preponderance of the evidence that he acted pursuant to a delusion of receiving a deific command. In other words, in such an instance, the judge must instruct that the defendant may not be held responsible for his actions "where a delusional command could be objectively recognized to confound the difference between lawful behavior and a moral imperative." Winder, supra, 200 N.J. at 251, 979 A.2d 312.

E
We are mindful that defendant did not object to the instructions given to the jury regarding his insanity defense. The argument he reprises here was first asserted in the trial court on defendant's motion for a new trial, far too late to assist the judge in crafting a correct jury charge on the point now hotly contested. Notwithstanding, we conclude that the absence of the amplified instruction required when the insanity defense is based on a deific command was capable of producing an unjust result. R. 2:10-2; see also State v. *745 Burns, 192 N.J. 312, 341, 929 A.2d 1041 (2007).
As has been well established, errors in a jury charge in a criminal case on material issues are viewed as "poor candidates for rehabilitation under the harmless error philosophy," State v. Vick, 117 N.J. 288, 289, 566 A.2d 531 (1989), and are presumed to constitute reversible error, State v. Jordan, 147 N.J. 409, 422, 688 A.2d 97 (1997). The judge's instructions on the insanity defense did not preclude the possibility that the jury believed that defendant acted on God's command and yet rejected the insanity defense by finding defendant understood what he did was legally wrong. Because it is not inconceivable that the jury rejected the insanity defense because it did not know that insanity could have been found if defendant knew what he did was legally wrong but nevertheless acted because of God's command, we are compelled to conclude the charge was capable of producing an unjust result.
Reversed and remanded for a new trial.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] We recognize that defendant's Point IV presents a colorable argument regarding the admission of post-mortem photographs in light of the absence of a dispute that defendant shot and stabbed Michelle. We need not determine, however, whether the admission of these photographs prejudiced defendant's right to a fair trial because we remand for a new trial for other reasons.
[3] M'Naghten's Case, 8 Eng. Rep. 718 (H.L. 1843).
[4] The Supreme Court rendered its opinion in Winder while the case at hand was on appeal. The trial judge relied on our unpublished opinion in Winder, which was later affirmed by the Supreme Court.
[5] Two members of the Court expressed a minority view that it should make "no difference whether the mentally ill defendant claims he was commanded to kill by God, the President, the Pope, or a rock star." 200 N.J. at 259, 979 A.2d 312 (Long, J., concurring).