48 A.3d 285

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. BOYCE
SINGLETON, JR., DEFENDANT–RESPONDENT.

Argued January 31, 2012—Decided July 30, 2012.

158

*Frank J. Ducoat,* Deputy Attorney General, argued the cause for appellant (*Jeffrey S. Chiesa,* Attorney General of New Jersey, attorney).

*John W. Douard,* Assistant Deputy Public Defender, argued the cause for respondent (*Joseph E. Krakora,* Public Defender, attorney).

Justice LaVECCHIA delivered the opinion of the Court.

In New Jersey, we adhere to the general proposition that a defendant who has the mental capacity to know basic societal mores that distinguish objectively between right and wrong is legally responsible for his criminal conduct. *See State v. Sikora,* 44 *N.J.* 453, 470, 210 *A.*2d 193 (1965). Mental illness does not in and of itself eliminate moral blameworthiness under the test for criminal insanity enshrined in the Code of Criminal Justice (Code). *See N.J.S.A.* 2C:4–1. As our Model Jury Charge illuminates for jurors, "[t]he law adopts a standard of its own as a test of criminal responsibility, a standard not always in harmony with the views of psychiatrists." *Model Jury Charges (Criminal),* § 2C:4–1 Insanity (Oct. 17, 1988). And, moreover, jurors are informed that the law does not require that the defendant actually consider the wrongness of his act when accomplishing the deed. Rather,

> [t]he question is not whether the defendant, when (he/she) engaged in the deed, in fact actually thought or considered whether the act was right or wrong, but whether defendant had sufficient mind and understanding to have enabled (him/her) to comprehend that it was wrong if defendant had used (his/her) faculties for that purpose.
>
> [*Ibid.*]

Thus, the test hinges on a defendant's general knowledge of society's mores and objective expectations about behavior. In *State v. Worlock,* 117 *N.J.* 596, 569 *A.*2d 1314 (1990), a narrow caveat was added for the delusional defendant who, at the time of a homicidal act, affirmatively acts under a direct command from God to kill the victim. This appeal raises an issue concerning *Worlock's* applicability.

In September 2005, defendant Boyce Singleton Jr. killed his pregnant girlfriend, Michelle Cazan. He was indicted and tried in June 2008, on a charge of first-degree murder and other related offenses, including tampering with evidence and hindering. Defendant has never disputed that he killed Cazan. His defense at trial was keyed to whether he should be found not guilty by reason of insanity. Afflicted with schizoaffective disorder, defendant had developed the delusional religious belief that he was in a form of communication with God and that he was authorized to kill those who violated "God's word." Defendant's mental illness was the centerpiece of the parties' summations and the trial court included the model charge on the insanity defense, which refers to the defendant's ability to comprehend that his action is wrong, in its instructions to the jury. Defendant interposed no objection to the insanity charge's content.

Defendant's insanity defense proved unsuccessful as the jury convicted him of murder, as well as the other charged offenses. In a motion for a new trial, defendant claimed for the first time that the jury should have been provided with a variant of the insanity-defense jury charge informing the jury that a defendant can be found not guilty by reason of insanity if he lacks the capacity to understand that his actions are morally wrong, even if he understands that they are legally wrong. In *Worlock, supra,* we recognized in dicta that such a jury charge might be necessary in cases where a defendant claims to have been compelled by a "command from God." 117 *N.J.* at 611, 569 *A.*2d 1314; *cf. State v. Winder,* 200 *N.J.* 231, 979 *A.*2d 312 (2009) (rejecting *Worlock's* applicability to facts of case). Finding no evidence that defendant acted under compulsion of a command from God when he murdered Cazan, the trial court concluded that circumstances warranting a *"Worlock"* variation to the model charge were not present. The court denied the motion for a new trial and imposed sentence on September 12, 2008.

Defendant appealed and a panel of the Appellate Division reversed the conviction and remanded for a new trial based on

finding the insanity-defense jury charge to have been incomplete. *State v. Singleton,* 418 *N.J.Super.* 177, 204–05, 12 *A.*3d 728 (App.Div.2011).

The State filed a petition for certification, which was granted. 207 *N.J.* 188, 23 *A.*3d 413 (2011). We now reverse.

## I.

### A. Background

Defendant's expert in forensic psychology and the State's expert agree that defendant suffers from schizoaffective disorder.[1] At trial defendant produced lay witnesses—five family members and one friend—and testified on his own behalf to provide insight into his mental illness prior to and during the events related to Cazan's death. That testimony showed that defendant had developed a set of delusional religious beliefs derived from his perspective on scripture. Importantly, he believes that he has an obligation to kill sinners, especially sinners who attempt to deter him from honoring God's word according to his strongly held, personal interpretation of the Bible's Old Testament.

Defendant's mental illness significantly manifested itself during his relatively brief period of attendance at college. In 2003, he turned to religious study for guidance, discipline, and a means of control over his life, but soon developed a preoccupation with the Bible and God and became obsessed with the Old Testament. His interpretation of scripture developed into a delusional system that, the experts agree, distorts his logical reasoning. For example, defendant came to believe that money was the root of all evil because people idolized it, rather than God. On one occasion, his

---

[1] The evidence concerning defendant's mental illness was presented to support defendant's insanity defense and also to show that mental illness could have affected his capacity to knowingly or purposely commit the offense. Defendant's claim of error based on the trial court's failure to give a diminished capacity instruction was not addressed in the Appellate Division's resolution of this matter.

distaste for money led him to choose imprisonment for failure to pay a court fine over violating his belief in the wrongness of using money. His mother obtained his release by paying the fine herself.

According to defendant, over time, he became convinced that he was a "soldier" for God. He testified that he came to believe that God communicates with him, although he does not claim to hear a distinct voice speaking or commanding him. Rather, he receives messages or communications from God while asleep.[2] As he explained in his testimony, and in a statement to police after Cazan's death, he felt a general obligation to kill sinners who did not comport themselves in accordance with his beliefs about God's expectations, once he explained those expectations to them. Indeed, in 2005, not long before Cazan's murder, defendant, who had moved back into his parents' home, told his older sister, Lakeisha, "if I didn't love you so much, you would have already been dead, because the voices told me to kill all of you all because you're sinning."

On another occasion, during the spring of 2005, defendant threatened the gay friend of his younger sister Shakia, who was staying at their parents' home. Defendant claimed that he "heard something say to me go downstairs and kill him because he was homosexual." Shakia's friend left the home without being physically harmed, but by July 2005, defendant's beliefs and behaviors had become too extreme for his mother and siblings. Although

---

[2] In explaining an instance of such a communication that occurred prior to the events surrounding Cazan's death, he identified a message related to his younger sister who suffered from serious seizures and was on medication. Defendant awoke one morning to inform her that he had received a message from God that she should cease taking the medication. He described the communication as follows: "His Spirit ministered to me and that I received like—a talk from Him, yes. Not, per se, did I hear His—His voice, specifically." He explained, "I was happy that God was talking to me. I mean, I was happy about that. You know, I felt like He used me, so if He used me, there was something about me that He obviously was pleased with."

defendant had not yet acted on his beliefs, he was asked to leave the home.[3]

On July 27, 2005, he moved in with Michelle Cazan, a friend of Shakia and a participant in the same bible studies group as defendant's mother and Shakia. The relationship became intimate within one week's time and, on September 12, 2005, Cazan told defendant that a home pregnancy test had confirmed that she was pregnant. Defendant killed her the next day. We turn next to the murder and subsequent events.

### B. Cazan's murder

On September 13, 2005, while Cazan was at work, defendant went with a friend to an Air Force and Army recruiting center to discuss enlistment, which he explained was motivated by a desire to help his "family," meaning his parents and siblings who were struggling, not Cazan. He claimed that he trusted in God to look after Cazan and the baby that was on the way. Still, he was conflicted about enlisting even to help his parents and siblings because he would be working for money, which would be contrary to his religious beliefs.

That afternoon defendant picked up Cazan from work later than she expected, causing her to miss an appointment she had scheduled with an organization that might have provided a source of employment for defendant. He knew that she was not happy about missing the appointment, but testified that they did not argue about it. However, there was tension between the two and they had a discussion during which he considered leaving Cazan's vehicle, but did not. Instead, he agreed to accompany her on a visit to her hometown of East Rutherford to see places that were important to her, including her brother's gravesite.

During the trip north, the two quarreled over their future. Cazan was concerned about his ability to provide for the baby. As

---

[3] In fact, as a result of the incident involving Shakia's friend, defendant's family started to pursue eviction proceedings against him.

for defendant, he had reached the conclusion that he would not enlist in military service because he was uncomfortable with the idea of serving "a God other than my God" by earning "evil" money. And, he became increasingly disturbed over Cazan's change of heart from earlier discussions in which they had talked about going "into the woods" and living apart from a money-based civilization. He felt she had turned from the religious beliefs and principles he thought they shared. He grew more upset with Cazan during that conversation because he felt as though she had not fully adopted his religious beliefs and, worse, she was driving a wedge between him and God. He testified that he began to view Cazan "[a]s a prostitute," because "she was prostituting herself to another God." Defendant said he "didn't trust her," and that he "didn't want to be around her ... [or] with her anymore." Moreover, on arriving in East Rutherford, defendant did not respond favorably as Cazan showed him the area. He said he became "enraged" by her "stories of mob activity" that allegedly had occurred in the vicinity. He regarded her as "bragging" about it, which offended him.

At approximately 10:30 p.m., the two arrived home at Cazan's condominium in Mansfield. Defendant claims that, at this point, he was very upset. After using the first-floor bathroom, he went upstairs to the bedroom where Cazan was and asked her to give him the keys to her BMW. She refused. He admitted at trial that had she given him the keys he would have left. However, when she would not give him the car keys, he pulled a revolver from his waistband and shot her four times, emptying the gun. One bullet went through her face and out behind her ear, another entered her chest and passed through her rib cage, chest cavity, and lungs, exiting through her lower back. Forensic evidence showed that Cazan was shot twice more in the back while on her hands and knees. One bullet traveled through her trachea and exited through her neck. Cazan began to choke on her own blood. Defendant said he "didn't want her to suffer," so he stabbed her, four times, in the chest and abdomen, one of which pierced her

lung. The stab wounds were between three and six inches in depth. She died within minutes.

Defendant took the knife, but left behind the handgun, and drove Cazan's car to the home of his friend William Britt, where both William and his brother John were. There he washed his hands of blood and gunshot residue and changed his clothes. During the next few hours, defendant and his friends drank alcohol and smoked marijuana. Although defendant told William and John that he had killed Cazan, neither believed him.

Early the next morning, defendant left Cazan's car around the corner from Britt's home in Trenton and walked to Morrisville, Pennsylvania where his parents lived. Along the way, he threw the knife into a canal. He did so because he said he had learned from "movies" that "you're supposed to get rid of the murder weapon." According to defendant, at that time, he "planned on running" and "kill[ing] everybody ... until [he] got killed." However, when he arrived in Morrisville at about 2:00 a.m., he met his older sister Lakeisha also arriving home and asked her to drive him to Cazan's house. According to Lakeisha, he told her that he had shot and stabbed Cazan, that she was dead, and that he had left the gun behind at the house. Lakeisha testified that during this trip, defendant had "many rambling conversations" in which he was not talking directly to her: "Whoever he was talking to or whatever he was hearing, he was responding to. But the conversation wasn't for me." At Cazan's home, he asked Lakeisha to let him out in the back of the home and to wait for him in the car.

According to defendant, after determining that no police or others were in or around Cazan's home, he went inside, retrieved his gun, wiped down the door handles, and otherwise attempted to clean the blood splatter. He placed the gun and the cleaning materials he had used in a garbage bag and left, returning to Lakeisha's car. He asked her to take him to Britt's home. Along the way she convinced him to go instead to their parents' home in Morrisville. There he told his father what he had done and fled the area, intending to go to a family member's home in North

Carolina, along the way retrieving his duffle bag from Britt's home. In his later statements he explained that the police were his enemy because, if he was captured, he could not serve God. However, when he reached Baltimore, he abandoned his plan and returned home after talking with his mother.

Arriving back at his parents' home, he told his family that he planned to turn himself in but wanted to "hold Cazan" before doing so. So, on September 15, he drove Cazan's BMW to her home. His brother, Damon, rode with him, and Lakeisha and his mother followed in a separate car. Damon testified that during the trip defendant "was talking to someone" other than him. Defendant entered Cazan's home alone, repositioned her body and clothing, and placed a stuffed animal, sprayed with perfume, at her side. Concerned by the amount of time that had elapsed, Damon entered the condo and said that he found defendant holding Cazan's body, "trying to wake her [and] telling her [to] wake up." Meanwhile, defendant's mother had arranged for the police to be contacted by one of Cazan's neighbors.

Mansfield Patrolman Jason Abadia responded and, after backup arrived, he arrested defendant. Abadia testified that defendant stated, "I killed her. I killed her. Don't leave her like that. Cover her up. I killed her." Abadia read defendant his *Miranda*[4] rights and defendant again stated that he had killed Cazan, explaining also what he had done with the knife and gun.

Detective Sergeant Lindsey Cooper of the New Jersey State Police took over the investigation approximately one hour later. To obtain a recorded statement from defendant, Cooper reread the *Miranda* rights to defendant. During the interrogation, defendant admitted killing Cazan and claimed that he could see a vision of her smiling through the window of the squad car when he was first placed under arrest, and later from the vantage of the room in which he was interrogated. In explaining his killing of Cazan, he stated that he was angry because of "that damn book,"

---

[4] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

which he clarified as referring to the Bible. Defendant told the officers, "I lost it and the devil kept f...ing with me, he just kept f...ing with me and I lost it ...." When asked if anyone else was involved in Cazan's killing, defendant answered, "No, the devil, god and the devil (inaudible) inside of me, outside of me, all over the place, all over the place."

## C. Trial

Defendant was charged with first-degree murder, *N.J.S.A.* 2C:11–3(a)(1) and (2); second-degree possession of a weapon (handgun) for an unlawful purpose, *N.J.S.A.* 2C:39–4(a); third-degree possession of a weapon (knife) for an unlawful purpose, *N.J.S.A.* 2C:39–4(d); third-degree unlawful possession of a weapon (handgun), *N.J.S.A.* 2C:39–5(b); third-degree hindering apprehension, *N.J.S.A.* 2C:29–3(b)(1); and fourth-degree tampering with physical evidence, *N.J.S.A.* 2C:28–6(1).

At trial, in addition to the family members who testified, Dr. Maureen Santina, a clinical and forensic psychologist, testified as an expert for defendant. She diagnosed defendant with schizoaffective disorder which causes hallucinatory experiences and delusional perceptions.[5] She testified that as a result of his delusional system, defendant lost his "ability to regulate his interpretation of the world and his reaction to the world." She explained that defendant became obsessed with his delusions, including his belief that God wanted him to kill sinners, even his own family, and concluded as follows:

> I think that he knew that he was killing her but I don't think that he understood the nature of his killing her. In other words, I think that he believed that he was

---

[5] As explained by Dr. Santina, a hallucination occurs when the mentally ill person hears a voice or sees visions. A person experiencing delusions does not necessarily experience hallucinations, but rather he or she will come to know God is speaking to them "within themselves" and then act accordingly; thus, a delusional person may believe he or she is receiving commands from God without hearing a voice or seeing a vision.

supposed to kill her. Whether he wanted to or not, he was supposed to kill her. And that he was supposed to kill her because God was ordering it.

## On redirect, Dr. Santina clarify,

As I said, [defendant] believed that God was telling him to do it. He said, I didn't want to kill her. He in the past, had family members that he had said God was telling him to kill them because he was seeing these people as being bad. And saying I don't want to do it but feeling he had to. He even talked to himself as not having the courage to do what God wanted.

So in that moment when he feels that God wants him to do it he says I have to do it, I'm supposed to do it because God wants me to do it. He believed that he was following God's word. And God as being the supreme authority who has the right to decide what's right or wrong.

The State's expert, Dr. Elliot Atkins, agreed with Dr. Santina's conclusion that defendant suffered from the severe mental illness of schizoaffective disorder. The State's expert further agreed that defendant operated under a delusional system. However, Dr. Atkins disagreed with Dr. Santina's conclusion that defendant was legally insane at the time of the killing. Dr. Atkins emphasized that defendant admitted to *not* hearing voices at the time of the killing. Rather, Dr. Atkins testified that defendant was merely acting on his interpretation of what God wanted. On direct examination, Dr. Atkins testified:

For example, he said that he only really heard the voices when he was sleeping. He said that most of these were really not voices, but just thoughts in his head. That he wasn't even able to describe the voice. And he said to me it was probably just some subconscious thing going on rather than a voice.

That the last time God had spoken to him was two years before the killing. That although he indicated that the idea that he should hurt someone came from God, he said that that information had never been transmitted to him from any voices. And he said it was just my interpretation. I never heard the voice of God.

When I asked him whether he had heard any voices on the night of the incident, he said no. So, although I agree that he was mentally ill at the time, what was going on at that time was not a psychotic episode where a voice is saying this is what you've got to do.

When asked on cross-examination whether defendant believed he could talk to God, Dr. Atkins responded, "he clarified for me that he didn't believe God was actually talking to him. But he believed in this delusional system that what he was thinking was God's wishes or God's will."

Dr. Atkins also pointed to several considerations that, in his opinion, indicated defendant knew what he was doing was wrong. First, defendant had a history of violence and aggression toward women, pointing to defendant's experiences with the mother of one of his children, and to the fact that he had been fighting with Cazan on the day of the killing. Second, defendant had stated that he stabbed Cazan, not to serve God, but to put her out of her misery. Third, Defendant drank alcohol and smoked marijuana at the Britts' apartment, which could indicate that defendant sought to dull the guilt he felt. Last, defendant's forensic evaluation test results indicated he was trying to "make himself look better ... by claiming that it was God that had him do this." Dr. Atkins also noted that defendant's decision to evade police was inconsistent with his claims of righteousness. Based on his evaluation of those considerations, Dr. Atkins opined that defendant was not acting in accordance with his delusional system at the time of the killing and that, therefore, "he knew that what he was doing was wrong."

The jury instruction that the court and all parties agreed would be given in this matter was the Model Jury Charge for the insanity defense. Drawing from the model charge, the court instructed the jury as follows:

Apart from his general denial of guilt, the defendant maintains that he is not guilty of the crimes charged by reason of insanity. . . .

. . . .

A hostile act, that is an illegal act, may in one case spring from wickedness, and in another from some infirmity or sickness of the mind, which the individual did not design. . . .

. . . .

The law adopts a standard of its own as a test of criminal responsibility, a standard not always in harmony with the views of psychiatrist[s]. If, at the time of committing the act, the defendant was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or if defendant did know it, that he did not know what he was doing was wrong, defendant—the defendant is then legally insane, and therefore, not criminally responsible for his conduct.

As you can see, the law regards insanity as a disease of the mind. It may be temporary or permanent in its nature, but the condition must be a mental disease. An accused may have the most absurd and irrational notions on some subject. He may be unsound in mind and be a fit subject for confinement and treatment in a

mental hospital, but if at the time of the offenses, the defendant had the mental capacity to distinguish right from wrong, and to understand the nature and quality of the acts done by him, he is subject to the criminal law.

. . . .

The question is not whether the defendant, when he engaged in the deed, in fact actually thought or considered whether the act was right or wrong, but whether the defendant had sufficient mind and understanding to have enabled him to comprehend that it was wrong, if the defendant has used—had used his faculties for that purpose.

The jury rejected defendant's insanity defense and convicted him of murder and the other charges. His post-trial challenge to the insanity-defense jury instruction was denied by the court. At sentencing, the court imposed a fifty-year term of imprisonment, with an eighty-five percent period of parole ineligibility, pursuant to the No Early Release Act, *N.J.S.A.* 2C:43–7.2, on the murder conviction, and a five-year prison term for the hindering conviction, to be served consecutively to the fifty-year term. The judge also imposed lesser terms that were made concurrent to the sentences for the murder and hindering convictions.

On appeal, the Appellate Division reversed the conviction and remanded for a new trial. *Singleton, supra,* 418 *N.J.Super.* 177, 12 *A.*3d 728. The panel held that defendant had presented sufficient evidence at trial to have required the trial court, sua sponte, to fashion a deific-command variant to the insanity-defense jury charge based on *Worlock. Id.* at 202–04, 12 *A.*3d 728. The panel was persuaded that the instruction was necessary because defendant testified that he believed killing his girlfriend was "the right thing because it was something God was telling [him] to do." *Id.* at 202, 12 *A.*3d 728. The panel noted also the confirming expert testimony that defendant believed he was compelled to obey what he perceived to be a command from God. *Id.* at 201, 12 *A.*3d 728. In light of that evidence, the panel concluded that failure to provide a deific-command instruction constituted plain error requiring reversal of the conviction. *Id.* at 203–04, 12 *A.*3d 728. On remand for a new trial, the panel held that "the judge must instruct that the defendant may not be held responsible for his actions 'where a delusional command could be objectively

recognized to confound the difference between lawful behavior and a moral imperative.' " *Id.* at 204, 12 *A.*3d 728 (quoting *Winder, supra,* 200 *N.J.* at 251, 979 *A.*2d 312).[6]

We granted the State's petition for certification. 207 *N.J.* 188, 23 *A.*3d 413 (2011).

## II.

The State offers alternative arguments why the decision of the Appellate Division should be reversed. First, the State maintains that the evidence presented at trial supports the trial court's decision to give only the model charge for the insanity defense and forego the deific-command variation described in *Worlock.* The *Worlock* charge is only appropriate in the "clearest and narrowest category of cases" in which a defendant believes that he or she has received a direct command from God ordering the defendant to commit an illegal act. *Winder, supra,* 200 *N.J.* at 251, 979 *A.*2d 312. The State contends that defendant's decision to kill Cazan sprang not from a perception that he had received a direct deific command, but rather from defendant's subjective, religiously de-rived, moral code under which he was generally obligated to kill those who did not interpret the Bible and follow God in the way that he did. Moreover, the State emphasizes that the circum-stances surrounding the killing indicate that defendant's immedi-ate motivation for murdering Cazan was his anger over Cazan's pregnancy and refusal to hand over her car keys, not his religious beliefs.

In the alternative, the State asks that we reject *Worlock,* "abandon the 'deific decree' variation of the insanity defense and abolish the distinction between legal and moral wrong." The State argues that *Worlock* introduced uncertainty and subjectivity into the operation of the insanity defense. The State contends

---

[6] The panel granted relief on this basis alone. Although defendant had other points of error, which the State contested, the panel did not address them in light of its holding on the jury-charge issue.

that reinterpreting the insanity test, so that a defendant who is able to understand the nature and quality of his acts can only invoke the defense if he is unable to comprehend that his acts are illegal, would create a more objective and workable standard.

Defendant argues that the Appellate Division correctly concluded that a *Worlock* jury charge was necessary in this matter. He points to several instances in the record, many relied on by the Appellate Division, where he claimed to have received direct communications from God. Defendant also contends that *Worlock* does not require a defendant to experience actual auditory hallucinations of the voice of God to secure a deific-decree jury charge; rather, he argues that it is enough that a defendant delusionally believes that God wants him to kill. In this case, defendant claims that there is no real dispute that he "suffered from a relatively stable delusion, over a period of years, that he was communicating with God, and that God was telling him to kill those who violated the Word."

In response to the State's argument that the deific-decree jury charge should be abandoned, defendant contends that the charge is required by the statutory language of the test for legal insanity in New Jersey. Because the Legislature adopted that language, defendant argues that only the Legislature can discard the *Worlock* charge. Moreover, even if the courts were free to abandon it, to do so in this case would violate the *Ex Post Facto* clauses of the United States and New Jersey Constitutions. *See U.S. Const.* art. I, § 10, cl. 1; *N.J. Const.* art. IV, § 7, ¶ 3.

### III.

### A.

The insanity defense exists in criminal law not to identify the mentally ill, but rather to determine who among the mentally ill should be held criminally responsible for their conduct. *Sikora, supra,* 44 *N.J.* at 470, 210 *A.2d* 193. As a sister jurisdiction has observed, "[t]he insanity defense is not available to all who are

mentally deficient or deranged; legal insanity has a different meaning and a different purpose than the concept of medical insanity." *State v. Crenshaw*, 98 *Wash.*2d 789, 659 *P.*2d 488, 491 (1983) (en banc). In New Jersey, *N.J.S.A.* 2C:4-1 sets forth the test for legal insanity:

A person is not criminally responsible for conduct if at the time of such conduct he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong. Insanity is an affirmative defense which must be proved by a preponderance of the evidence.

*N.J.S.A.* 2C:4-1 codifies the common-law *M'Naghten* [7] test for legal insanity, which was originally formulated in England in the 1840s. *See Winder, supra*, 200 *N.J.* at 242-45, 979 *A.*2d 312 (discussing history of *M'Naghten* test in England and New Jersey); *Worlock, supra*, 117 *N.J.* at 602-04, 569 *A.*2d 1314 (same). Our state adopted the *M'Naghten* test shortly after it was introduced in England, *see State v. Spencer*, 21 *N.J.L.* 196, 204-05 (Oyer and Terminer 1846), and has employed it consistently thereafter, *see, e.g., State v. Coleman*, 46 *N.J.* 16, 39, 214 *A.*2d 393 (1965); *State v. Lucas*, 30 *N.J.* 37, 72, 152 *A.*2d 50 (1959); *State v. Maioni*, 78 *N.J.L.* 339, 341-42, 74 *A.* 526 (E. & A.1909). When the Legislature adopted *N.J.S.A.* 2C:4-1 in 1978, *L.* 1978, *c.* 95, it chose to preserve the *M'Naghten* test in spite of a recommendation from the New Jersey Criminal Law Commission to abandon it in favor of the Model Penal Code test. *See* 2 *Final Report of the New Jersey Criminal Law Revision Commission*, commentary to § 2C:4-1, at 96-97 (1971).

■ The *M'Naghten* test provides two distinct paths for a defendant to demonstrate that he was legally insane at the time he committed an act and therefore not criminally responsible for his conduct. First, a defendant can show that "he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing." *N.J.S.A.* 2C:4-1. Second, even if the defendant did know the nature and quality of

---

[7] *M'Naghten's Case*, 8 *Eng. Rep.* 718 (H.L.1843).

the act, he can still establish legal insanity if, because of a "disease of the mind," "he did not know what he was doing was wrong." *Ibid.*

In the century-and-a-half since the *M'Naghten* test was formulated, courts have recognized that the term "wrong" in the second part of the test is susceptible of multiple interpretations. *See People v. Schmidt,* 216 *N.Y.* 324, 110 *N.E.* 945, 946–49 (1915) (recognizing ambiguity and discussing possible interpretations); *see also Diestel v. Hines,* 506 *F.*3d 1249, 1271–73 (10th Cir.2007), *cert. denied,* 553 *U.S.* 1079, 128 *S.Ct.* 2875, 171 *L.Ed.*2d 812 (2008) (same); *Crenshaw, supra,* 659 *P.*2d at 492–94 (same). One interpretation would equate the term "wrong" with illegality. Under that understanding, a defendant invoking the insanity defense must demonstrate that despite knowing "the nature and quality of the act he was doing," he suffered a disease of the mind that prevented him from understanding that the act was illegal. *See N.J.S.A.* 2C:4–1. A minority of states that follow the *M'Naghten* test have adopted that interpretation. *See State v. Hamann,* 285 *N.W.*2d 180, 183 (Iowa 1979); *State v. Boan,* 235 *Kan.* 800, 686 *P.*2d 160, 168 (1984); *see also Regina v. Windle,* 2 *Q.B.* 826 (1952) (interpreting "wrong" to mean legal wrong in England).

However, a majority of states following the *M'Naghten* test have interpreted "wrong" as encompassing legal as well as moral wrong. *See State v. Skaggs,* 120 *Ariz.* 467, 586 *P.*2d 1279, 1284 (1978); *People v. Skinner,* 39 *Cal.*3d 765, 217 *Cal.Rptr.* 685, 704 *P.*2d 752, 764 (1985); *People v. Serravo,* 823 *P.*2d 128, 137 (Colo. 1992) (en banc); *State v. Cole,* 254 *Conn.* 88, 755 *A.*2d 202, 210 (2000); *Schmidt, supra,* 110 *N.E.* at 949; *State v. Pittman,* 373 *S.C.* 527, 647 *S.E.*2d 144, 170 (2007); *State v. Cameron,* 100 *Wash.*2d 520, 674 *P.*2d 650, 653–54 (1983) (en banc); *Wilson v. State,* 273 *Wis.* 522, 78 *N.W.*2d 917, 920 (1956); *see also United States v. Ewing,* 494 *F.*3d 607, 617 (7th Cir.2007) (discussing federal courts' position that wrong encompasses "the broader meaning of moral rather than criminal wrongfulness" (citation omitted)). Under that interpretation, a defendant who under-

stands that his actions are contrary to law nonetheless may successfully invoke the insanity defense if he lacked the capacity to understand that his actions were morally wrong. Courts that follow that approach generally assess moral wrong from a societal, and not a personal, standard, requiring a defendant to show that he did not understand that his actions contravened generally accepted objective societal notions of morality. *See, e.g., Serravo, supra,* 823 *P.*2d at 137–38 (adopting that standard and citing other jurisdictions adopting same approach); *Crenshaw, supra,* 659 *P.*2d at 493–94 (same).

## B.

Our Court addressed the ambiguity in the term "wrong" for the first time in *Worlock.* In that case, the defendant was convicted of murder after shooting and killing two friends. *Worlock, supra,* 117 *N.J.* at 599–601, 569 *A.*2d 1314. At trial, the defendant did not deny his involvement in the killings, but relied instead on a defense of legal insanity. *Id.* at 601, 569 *A.*2d 1314. He claimed to have believed the killings were justified because "might makes right" and the laws of society are only meant for "subservient people," and the defendant did not consider himself to be in that category. *Id.* at 614, 569 *A.*2d 1314. After the defendant presented his defense, the trial court charged the jury with the legal definition of insanity, but did not define the meaning of the term "wrong." *Id.* at 612, 569 *A.*2d 1314. On appeal, the defendant argued that the trial court should have instructed the jury that the term "wrong" can mean either legal or moral wrong, so that the jury would have known that it could acquit in the event it found that he did not understand that his actions were morally wrong, even if he knew them to be against the law. *Id.* at 606, 569 *A.*2d 1314.

We held that the term "wrong" embraces more than just the concept of legal wrong, *id.* at 610, 569 *A.*2d 1314 and that "a defendant's ability to appreciate society's morals may be relevant

to the determination of his sanity," *id.* at 609, 569 *A.*2d 1314. Importantly, we added that

[i]n the vast majority of cases, if the defendant was capable of understanding that he was acting contrary to law, he would also have sufficient capacity to understand that he was acting contrary to the morals of society. Law is largely the crystallization of societal morals. Rarely would an allegedly illegal act not also be wrongful morally. Thus, "wrong" as used in the insanity defense will generally incorporate notions of both legal and moral wrong.

[*Id.* at 609–10, 569 *A.*2d 1314.]

Because legal and moral wrong are usually "coextensive," especially when the criminal act at issue is murder, we held that a jury charge explaining that "wrong" encompasses both legal and moral wrong is almost always unnecessary and would more often than not only serve to confuse the jury. *Id.* at 610–11, 569 *A.*2d 1314. But, in the odd case in which a defendant is able to recognize that his actions are legally wrong but is nonetheless incapable of understanding that they are morally wrong, we held that "the court should instruct the jury that 'wrong' encompasses both legal and moral wrong." *Id.* at 611, 569 *A.*2d 1314.

We emphasized that the insanity defense has always been premised on a "defendant's ability to comprehend whether his or her actions would ordinarily be disapproved by society." *Id.* at 610, 569 *A.*2d 1314. Thus, we held that "the concept of moral wrong must be judged by societal standards, not the personal standard of the individual defendant. As a general rule, it will not be sufficient, therefore, that a defendant's personal moral code justified a killing otherwise prohibited by law and societal morals." *Ibid.* (citations omitted). In other words, in order to warrant a jury charge explaining the concepts of legal and moral wrong, a defendant would have to show that, at the time he committed the crime, he believed that his actions were morally right under prevailing social norms, not just his own "idiosyncratic code of morality." *Id.* at 614, 569 *A.*2d 1314.

We observed that there is only one "generally-recognized" situation in which legal and moral wrong become sufficiently distinct to necessitate a jury charge defining the term wrong: when "the defendant contends that he or she knowingly killed

another in obedience to a command from God." *Id.* at 611, 569 A.2d 1314. In such a scenario, a defendant could justifiably believe that although he acted contrary to law, society would consider his actions to have been morally right. *Ibid.* We noted that there might be situations other than a deific decree to kill in which a defendant could at the same time understand that his actions were legally wrong but believe them to be morally right under prevailing social values, but declined to speculate on what those scenarios might be. *Ibid.*

Applying the above standard to the facts of the case, we held that Worlock had not demonstrated that he believed society would have approved of his killings. *Id.* at 614, 569 A.2d 1314. Indeed, we noted that he "viewed society with contempt" and candidly admitted that the moral code by which he lived was not for "the folly-ridden mass." *Ibid.* Thus, because it was clear that Worlock had the capacity to understand that his actions were morally wrong under conventional notions of morality, we held that the trial court did not err in declining to define the word "wrong" for the jury. *Ibid.*

Recently, we had occasion to revisit the standard introduced in *Worlock* and again consider whether a defendant had presented the kind of insanity defense that would necessitate a jury charge defining the term "wrong." In *Winder, supra,* the defendant shot and killed a cab driver outside of a police station, and immediately turned himself in to confess to the crime. 200 *N.J.* at 238, 979 A.2d 312. The defendant maintained that he killed the driver because he believed that his parents were trying to kill him and was convinced that prison was the only place he could be safe from them. *Id.* at 238, 249, 979 A.2d 312. The defendant pursued an insanity defense at trial, presenting an expert witness who testified that he suffered from paranoid schizophrenia and heard voices compelling him to kill. *Id.* at 239, 979 A.2d 312. At the charge conference, defense counsel requested that the jury be given an insanity instruction that, following *Worlock,* included an explanation that the term "wrong" encompasses both legal and moral

wrong. *Id.* at 240, 979 *A.*2d 312. The trial court denied the request and instructed the jury with the model insanity charge. *Ibid.* The jury found the defendant guilty of first-degree murder and related weapons offenses. *Ibid.*

On appeal, the defendant challenged the trial court's decision to forego the *Worlock* charge, contending that his case presented one of the " 'other delusion-based exceptions' " that we intimated could necessitate a jury charge on the definition of "wrong." *Id.* at 249, 979 *A.*2d 312 (quoting *Worlock, supra,* 117 *N.J.* at 611, 569 *A.*2d 1314). We disagreed, and reemphasized that, outside of the "deific-command delusion" discussed in dicta in *Worlock,* situations in which a defendant could understand that his actions were illegal but be incapable of understanding that society would disapprove of them are exceedingly rare. *Id.* at 249–50, 979 *A.*2d 312. We explained that

> [o]ur reference to other delusion-based exceptions in *Worlock* was not meant to expand the narrow field of potential exceptions to the general understanding that legal and moral wrong, particularly in murder cases, are coextensive. The hurdle to overcoming societal disapproval of the killing of another human being cannot be accomplished easily by references to subjective beliefs, personal preferences, or even alternative notions of morality, unrelated to mental illness, that clash with the law and the mores of society.
>
> [*Id.* at 250, 979 *A.*2d 312.]

We held that the defendant in *Winder* was not entitled to a *Worlock* charge because his actions immediately before and after the killing "demonstrated knowledge of the social unacceptance of his deed." *Id.* at 249, 979 *A.*2d 312. Moreover, the defendant's delusions had no apparent impact on his ability to appreciate the way in which society would view the murder. *Id.* at 250, 979 *A.*2d 312. The defendant believed that the only way he could be safe from his parents' machinations was to go to prison, and settled on murder as the best way to effect his entry. *Id.* at 249, 979 *A.*2d 312. There was no indication that the defendant delusionally believed that society would give its blessing to his use of murder to escape his parents. *Id.* at 250, 979 *A.*2d 312. Thus, because we could discern "no credible claim of moral rightness" flowing from

the defendant's delusions, we upheld the trial court's decision to give the standard insanity charge. *Ibid.*

## IV.

We dispense at the outset with the State's argument that we should abandon *Worlock's* recognition of a deific-command exception to the general charge covering criminal insanity. Stare decisis and other stabilizing principles of the law compel us to reject that request.

As recently as this term we noted that "[s]tare decisis is a principle to which we adhere for the sake of certainty and stability." *State v. Shannon*, 210 *N.J.* 225, 226, 43 *A.*3d 1146 (2012) (citations omitted). Nonetheless, stare decisis is not so inviolate that it should "foreclose reanalysis" when warranted. *Ibid.* (citations omitted). It is undeniably a healthy practice for a court of last resort to re-examine its own doctrine, but, consistent with the practice of other courts of last resort, we have required "special justification" to overturn the persuasive force of precedent. *See Luchejko v. City of Hoboken*, 207 *N.J.* 191, 208–09, 23 *A.*3d 912 (2011) (citations omitted); *State v. Brown*, 190 *N.J.* 144, 157, 919 *A.*2d 107 (2007). Finding such circumstances can depend on whether a particular decision has proven to be unsound or unworkable in practice, as the State here argues. *See Allied–Signal, Inc. v. Dir., Div. of Taxation*, 504 *U.S.* 768, 783, 112 *S.Ct.* 2251, 2261, 119 *L.Ed.*2d 533, 549 (1992). However, in matters where a judiciary may rely on legislative correction, special justification for disturbing precedent is difficult to establish.

Statutory-based decisions are less likely to be subject to reconsideration because the legislative branch can correct a mistaken judicial interpretation of a legislative enactment. Indeed, as a principle of statutory construction, the legislative branch is presumed to be aware of judicial constructions of statutory provisions. *See White v. Twp. of N. Bergen*, 77 *N.J.* 538, 556, 391 *A.*2d 911 (1978) ("[T]here is ample precedent in New Jersey to support the proposition that, where a statute has been judicially construed,

the failure of the Legislature to subsequently act thereon evidences legislative acquiescence in the construction given the statute."); 2B Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction* § 49:10 at 137 (7th ed. 2008) ("A number of decisions have held that legislative inaction following a contemporaneous and practical interpretation is evidence that the legislature intends to adopt such an interpretation."). Thus, legislative acquiescence to an interpretation of a statute renders the judicial decision an unlikely candidate for abandoning stare decisis. That is precisely the circumstance here.

*Worlock's* explanation of the general confluence of legal wrong with moral wrong in the legislative use of the single term, "wrong," in *N.J.S.A.* 2C:4-1, and our holding out of the possibility that a special instruction may be necessary to explain a divergence of the two only in the clearest and narrowest category of class of cases, occurred more than two decades ago. *Worlock's* interpretation of the *M'Naghten* test, adopted by the Legislature in *N.J.S.A.* 2C:4-1, has stood since, without reaction by the legislative branch in the interim. Nor has there been a legislative reaction since *Winder* reinforced a restrictive approach to the application of *Worlock*, not a more expansive one as the concurrence in *Winder* had urged. Due to the Legislature's longstanding acceptance of *Worlock*, and the fact that we are addressing a settled interpretation of case law, we decline to accept the invitation to overturn *Worlock* at this point in time, even were we to concede some merit to the argument.

We turn therefore to consider whether there was plain error in the trial court's jury instruction on the insanity defense in this matter.

## V.

### A.

Certain principles pertain in the review of jury instructions. Jury charges must provide a "comprehensible explanation

of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." *State v. Green*, 86 *N.J.* 281, 287–88, 430 *A.*2d 914 (1981). The charge as a whole must be accurate. *State v. Wilbely*, 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973); *State v. Thompson*, 59 *N.J.* 396, 411, 283 *A.*2d 513 (1971). If the defendant does not object to the charge at the time it is given, there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case. *State v. Macon*, 57 *N.J.* 325, 333–34, 273 *A.*2d 1 (1971).

At trial, defendant did not challenge the jury instruction that used the model charge on insanity until after a guilty verdict had been returned. Thus, the question here presented is whether the trial court erred in not sua sponte including additional language separating defendant's ability to appreciate legal wrong from moral wrong based on "deific commands" to kill.[8]

 Appellate review applies the plain error standard when a defendant fails to object to a given jury charge. *See R.* 1:7–2; *State v. Wakefield*, 190 *N.J.* 397, 473, 921 *A.*2d 954 (2007) ("[T]he failure to object to a jury instruction requires review under the plain error standard."). Plain error is that which is "clearly capable of producing an unjust result." *R.* 2:10–2. In respect of a late claim of error in a jury instruction, "plain error requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently

---

[8] Like the situation in the cases cited by the dissent, *see post* at 193–94, 48 *A.*3d at 306, defendant was not denied the opportunity to assert an insanity defense, and the jury received the model jury charge on the defense, *see People v. Coddington*, 23 *Cal.*4th 529, 97 *Cal.Rptr.*2d 528, 2 *P.*3d 1081, 1139–40 (2000), *overruled in part on other grounds, Price v. Superior Court*, 25 *Cal.*4th 1046, 108 *Cal.Rptr.*2d 409, 25 *P.*3d 618, 633 n. 13 (2001); *State v. Blair*, 143 *N.H.* 669, 732 *A.*2d 448, 450 (1999); *State v. Lafferty*, 20 *P.*3d 342, 363 (Utah 2001). Our dissenting colleagues' observation that "deific commands come in many forms and that courts do not reject the defense based on the manner in which the instruction has been purportedly received or revealed" misses that essential point when seemingly asserting that those cases undermine what occurred in this matter. *Post* at 193–94, 48 *A.*3d at 306. Defendant's insanity defense was not "rejected" by the trial court.

grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" *State v. Chapland*, 187 *N.J.* 275, 289, 901 *A.*2d 351 (2006) (quoting *State v. Hock*, 54 *N.J.* 526, 538, 257 *A.*2d 699 (1969), *cert. denied*, 399 *U.S.* 930, 90 *S.Ct.* 2254, 26 *L.Ed.*2d 797 (1970)).

## B.

In *State v. Walker*, 203 *N.J.* 73, 999 *A.*2d 450 (2010), we recently addressed the issue of "when a trial court should instruct the jury on the defense to statutory felony murder in the absence of a request to charge from counsel." *Id.* at 86, 999 *A.*2d 450. We determined that a requested jury instruction should be given if "there is a rational basis in the record to give it . . . . On the other hand, if counsel does not request the instruction, it is only when the evidence clearly indicates the appropriateness of such a charge that the court should give it." *Id.* at 87, 999 *A.*2d 450.

The delusional command variation of the insanity defense is a much more limited defense than that which we considered in *Walker*. *See Winder*, *supra*, 200 *N.J.* at 250-51, 979 *A.*2d 312; *Worlock*, *supra*, 117 *N.J.* at 611, 569 *A.*2d 1314. We said clearly in *Worlock* that "[b]elief in an idiosyncratic code of morality does not constitute the defense of criminal insanity." 117 *N.J.* at 614, 569 *A.*2d 1314; *see also Crenshaw*, *supra*, 659 *P.*2d at 493-94 (concluding that personal moral beliefs will not exculpate defendant when he or she knew killing was contrary to societal moral and legal norms). "*Worlock* cracked open the door only to a command delusion that, objectively viewed, could have rendered it impossible for its hearer to know the difference between right and wrong." *Winder*, *supra*, 200 *N.J.* at 249, 979 *A.*2d 312. A rigorous standard was expressed and applied in *Winder* consistent with the few decisions around the country to have grappled with such circumstances.[9]

---

[9] In one of the few jurisdictions to have addressed such circumstances, Washington state courts similarly have hewed to a path in respect of deific

Applying to this case that stringent standard for qualification into the narrow and clear class of cases envisioned to satisfy a deific command to kill, we conclude that the evidence does not clearly indicate that it was impossible for defendant to appreciate that killing Cazan was contrary to society's morals. The *Worlock* variation of the insanity-defense jury charge is not available to all those who intuit reprehensible obligations or develop idiosyncratic moral compulsions from interpreting religious material. Were that all that was required in order to constitute a deific "command," then acting pursuant to any such personal belief system would qualify as lack of knowledge of having committed "moral" wrong and a defendant would no longer have to show that he believed that society would not objectively disapprove of the moral wrongness of the action. The decision in *Winder* was circumscribed carefully to ensure that such a result would not come to fruition. *See Winder, supra,* 200 *N.J.* at 248–51, 979 *A.*2d 312.

Here, defendant claimed to have formed a general belief that he ought to kill sinners who refused to follow his explanation of God's expectations. In essence, defendant had an idiosyncratic personal belief system analogous, albeit in different form, to that in *Worlock. See also State v. DiPaolo,* 34 *N.J.* 279, 292–93, 168 *A.*2d 401 (1961) (distinguishing between insane delusion that negates consciousness of immorality of act from delusion that does not prevent defendant from simultaneously appreciating that deed was contrary to law); *Crenshaw, supra,* 659 *P.*2d at 494–95 (holding that defendant claiming Moscovite belief system that calls for killing as retribution for adultery is not entitled to deific-command adjustment to jury charge on criminal insanity).

---

commands, requiring a substantial showing that a defendant's will has been "subsumed." *Crenshaw, supra,* 659 *P.*2d at 494–95 (requiring that will be subsumed in order for specialized instruction to be utilized). *See, e.g., State v. Rice,* 110 *Wash.*2d 577, 757 *P.*2d 889, 904 (1988) (adhering to strident test that authorizes jury instruction on legal-moral dichotomy only when defendant presents evidence that "his free will has been subsumed by his belief in the deific decree"), *cert. denied,* 491 *U.S.* 910, 109 *S.Ct.* 3200, 105 *L.Ed.*2d 707 (1989).

Defendant's personal belief system was based on his own interpretation of scripture, fortified through dreams in which he believed to receive communications from God, which does not render his belief system in his "right to kill" certain sinners the equivalent of a command from God to kill.

Moreover, defendant had demonstrated on prior occasions the ability to exercise his own will and resist the obligation he perceived from God's teachings. Defendant had chosen not to kill his family or their friends despite his religious delusions generally and his specific belief, expressed on occasion, that they were sinners. Defendant also determined that he would not kill anyone to whom he had not had a chance to explain his religious beliefs. For example, he decided that he would not attempt to hurt or kill Britt's brother because defendant had not taught him to believe in God's word as defendant interpreted it, and also because he was bigger and apparently stronger than defendant. Defendant's inconsistent application of "God's will" and the concomitant deific desire that he kill sinners, which he claims to have perceived, and his reluctance to kill those whom he had not tried to convert, indicates his awareness of an objective societal disapproval of the personal religious belief system he had developed.

Defendant also has failed to demonstrate entitlement to a *Worlock* charge because the evidence does not clearly indicate that he was acting pursuant to a delusional command at the time of the killing. As explained in *Winder,* an amplified criminal insanity charge differentiating between legal and moral wrong is available only to a defendant whose will is overborne by a perceived divine command that overcomes the ability to be conscious of society's law and mores disapproving of that "command." *See Winder, supra,* 200 *N.J.* at 247–48, 979 *A.*2d 312 (citing *Crenshaw, supra,* 659 *P.*2d at 494–95; *DiPaolo, supra,* 34 *N.J.* at 293, 168 *A.*2d 401). There is a necessary temporal proximity to the action for which a defendant is charged and the overbearing of his will by God's order or command at the time of the action. In rejecting a *Worlock* instruction in *Winder,* we curbed expansion of *Worlock* in

part because there was no showing that the defendant was operating under a direct command from God at the time of the killing. Here, defendant admitted that he never heard a voice or saw a vision that commanded him to kill Cazan when he committed the murderous act.[10] Moreover, defendant admitted that he had not received any specific command to kill Cazan at the moment of the killing, and indeed had not received any communications from God for some time.

Nothing in *Winder's* application of the law to its facts supports the extrapolation made by the appellate panel in this matter, which would permit anyone who interprets a religious text in an outrageous and violent manner to a deific-command, insanity-defense charge. Isolated references to voices, and to communication with God through scripture and in dreams, are not the equivalent of a command from God, at the time of the killing, sufficient to demonstrate that it deprived defendant of his ability to appreciate society's disapproval of his action. The appellate panel mistakenly accepted defendant's belated argument that the charge, given in its classic form, was insufficient for the jury to consider his insanity defense. Plain error is not present in the charge given here on this record.

Defendant's complaints post-trial and on appeal that, in light of *Worlock* and *Winder*, the charge required clarification are not consistent with precedent as to the factual requirements needed to trigger a deific-command variation to the insanity-defense jury charge.[11] What the record shows is that, based on defendant's

---

[10] It is insufficient that defendant can point to isolated references he made to hearing a voice, or "hearing" God speaking to him through his scripture study or in his dreams. The Appellate Division's citation to such examples, here and there, in the record do not comprise the quality or quantity of evidence that was contemplated by our earlier decisions. *See Singleton, supra,* 418 *N.J.Super.* at 197–99, 12 *A.3d* 728.

[11] *Winder* signaled a restrictive application of a deific-command variation to the model charge on criminal insanity, to the extent it would ever be allowed.

interpretation of the Bible, he believed Cazan was a sinner. And, he similarly interpreted "God's word" to direct that he kill sinners. That is not the type of case to which we referred in *Winder* when we discussed a deific-command clarification to the insanity-defense charge. And, more pointedly, there is too tenuous a connection between any "alleged" deific command and the murder that occurred in this matter on which to base a reversal on plain error. Defendant admitted that he would have left and not killed Cazan if she only had given him the car keys. He thereafter stated that he stabbed Cazan, not to kill her, but to put her out of her misery. Since the killing, defendant has questioned whether it was God's will for him to kill Cazan.[12]

In sum, we conclude that the evidence does not clearly indicate defendant killed Cazan as a result of a deific command. Defendant was entitled to assert an insanity defense, and he did. He received an insanity jury charge. The trial court did not commit plain error by failing to give, sua sponte, a *Worlock* charge as part of the insanity-defense jury instruction. Defendant's conviction should not have been reversed on appeal on that basis. We express no view on the other claims of error raised on appeal that were not addressed by the Appellate Division. Those issues can be addressed on remand.

## VI.

The judgment of the Appellate Division is reversed and the matter is remanded to the Appellate Division for consideration of defendant's remaining claims of error.

---

The Appellate Division's interpretation of *Winder*, as well as the dissent's, instead expands it and would send even more arguable cases than this one to the jury.

[12] The defense expert testified to the following: "And [defendant] said to me that now in retrospect looking at it, he felt that God, that Satan had actually tricked him into thinking that it was God. And that God was actually trying to stop him but that he was tricked by Satan."

Justice PATTERSON, concurring.

I concur with the majority opinion, which reverses the determination of the Appellate Division panel and holds that defendant Boyce Singleton, Jr. was not entitled to the deific command jury instruction addressed by this Court in *State v. Worlock*, 117 *N.J.* 596, 611, 569 *A.*2d 1314 (1990). The majority opinion faithfully follows the reasoning in *Worlock* and *State v. Winder*, 200 *N.J.* 231, 979 *A.*2d 312 (2009). For the reasons articulated by Justice LaVecchia, I agree that defendant's belated invocation of the deific command variation of the insanity defense was unsupported in the circumstances of his crime.

I write separately because in my opinion, the deific command concept is neither mandated by the Legislature in *N.J.S.A.* 2C:4–1 nor firmly rooted in our jurisprudence, and should not be part of our law. It invites a defendant to exploit a core value of our society, respect for the religious beliefs of others, for tactical advantage. The deific command concept does not meaningfully guide a jury's exploration of the intricate issues raised by the insanity defense. Instead, it can reduce the dispassionate analysis of a defendant's mental state, envisioned by the Legislature when it codified the insanity defense, to a superficial review of the defendant's religious utterances. Application of the deific command results in inequitable treatment of defendants who have committed similar crimes based on nothing more than one person's assertion of a religious delusion. In my view, a defendant's claim that he or she heeded a deity's purported instruction to commit a murder or other crime should not prompt a jury instruction that suggests a finding of legal insanity within the meaning of *N.J.S.A.* 2C:4–1.

Neither the plain language nor the legislative history of *N.J.S.A.* 2C:4–1 warrants special consideration for defendants who claim that deific commands prompted their crimes. The statute at issue bars the imposition of criminal responsibility for conduct if, at the time of the crime, the defendant "was laboring under such a defect of reason, from disease of the mind as not to know the

nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong." *N.J.S.A.* 2C:4–1. The Legislature did not expressly or by implication define the word "wrong" as used in *N.J.S.A.* 2C:4–1. It provided no instruction that a defendant's failure to comprehend that his or her act was "wrong" should mean anything other than he or she did not understand that it was an illegal act.

As the majority notes, the statute codified the test articulated by the House of Lords in *M'Naghten's Case,* 8 *Eng. Rep.* 718 (H.L.1843), long accepted as the formulation of the insanity defense in New Jersey case law. *Statement to Senate Bill No. 738,* at 3 (May 15, 1978). The *M'Naghten* rule, reflected in our statute, did not differentiate between defendants who invoke deific commands and defendants who do not. In this Court's articulation of the *M'Naghten* rule—relied on by the drafters of New Jersey's Penal Code, 2 *Final Report of the New Jersey Criminal Law Revision Commission,* commentary to § 2C:4–1, at 96 (1971)—the Court held that a defendant could invoke the insanity defense if "the accused was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know what he was doing was wrong." *State v. Coleman,* 46 *N.J.* 16, 39, 214 *A.*2d 393 (1965). That construction, adopted nearly verbatim by the Legislature in *N.J.S.A.* 2C:4–1, refers to "wrong" without reference to religious belief. It does not contemplate a deific delusion as part of the test for insanity.

To the extent that the deific command permutation of the insanity defense has gained a foothold in New Jersey law, it has done so through this Court's dicta, not legislative action. The concept originated in the New York Court of Appeals, finding its source in dicta written by Judge Cardozo in *People v. Schmidt,* 216 *N.Y.* 324, 110 *N.E.* 945 (1915). There, the defendant concocted—and later recanted—an elaborate account of visions and voices conveying directions from God that he should kill a woman "as a sacrifice and atonement." *Id.* at 945. Although the defendant

conceded "that he never saw the vision and never heard the command," *id.* at 950, Judge Cardozo nonetheless introduced to New York law a distinction between legal and moral "wrong" illustrated by a hypothetical scenario:

A mother kills her infant child to whom she has been devotedly attached. She knows the nature and quality of the act; she knows that the law condemns it; but she is inspired by an insane delusion that God has appeared to her and ordained the sacrifice. It seems a mockery to say that, within the meaning of the statute, she knows that the act is wrong.

[*Id.* at 949.]

*Schmidt* was first noted by this Court in *State v. DiPaolo,* 34 *N.J.* 279, 292–93, 168 *A.*2d 401, *cert. denied,* 368 *U.S.* 880, 82 *S.Ct.* 130, 7 *L.Ed.*2d 80 (1961). However, it was not until 1990, more than a decade after the enactment of *N.J.S.A.* 2C:4–1, that the Court suggested in *Worlock* that the statute could be construed to incorporate the deific command concept.

As the majority recounts, the principle that a deific delusion could illustrate a potential distinction between legal and moral wrong was addressed for the first time by this Court in *Worlock, supra,* 117 *N.J.* at 608–09, 569 *A.*2d 1314. Like the discussion of the deific command in *Schmidt,* the Court's first articulation of this theory was in dicta and did not apply to the facts of the case. The defendant in *Worlock* attributed his killing of two friends not to a purported deific command, but to his stated belief that he was exempt from the laws of society, which in his view were intended to govern only the "subservient." *Id.* at 614, 569 *A.*2d 1314. The Court discussed the distinction between "legal" and "moral" wrong, noting that in most cases the two concepts converge. *Id.* at 610–11, 569 *A.*2d 1314. The Court made the following observation:

Occasionally, however, the distinction between moral and legal wrong may be critical. For example, if the defendant contends that he or she knowingly killed another in obedience to a command from God, a jury could find that the defendant was insane. *Schmidt, supra,* 110 *N.E.* at 949; *see also DiPaolo, supra,* 34 *N.J.* at 291–93 [168 *A.*2d 401] ("The experts disagreed upon whether there was evidence of a psychosis to support the alleged delusion, but none suggested that if defendant in fact suffered an insane delusion that God commanded the deed, he nonetheless was legally sane if he simultaneously appreciated that the deed was contrary to law.").

[*Id.* at 611, 569 A.2d 1314.]

Although the *Worlock* defendant had not suggested that the murders he committed were directed by any deity, the Court postulated that in an "exceptional case, such as the deific exception in which the defendant claims that he or she acted under a command from God, the court should instruct the jury that 'wrong' encompasses both legal and moral wrong." *Ibid.* For defendant Worlock, the Court found no such exceptional circumstances. *Id.* at 613–14, 569 A.2d 1314.

In *Winder*, the Court recognized its prior discussion of the deific command, but nonetheless rejected the defendant's claim that he was entitled to a jury charge regarding the distinction between legal and moral wrong in his trial for the murder of a taxi driver. *Winder, supra,* 200 *N.J.* at 250, 979 A.2d 312. The Court concluded that the defendant in *Winder,* who attempted to justify his act by professing his belief that his parents were trying to kill him, was not entitled to the jury instruction that he sought. In doing so, the Court reiterated the narrow scope of any "delusion-based" exceptions to the rule that legal wrong and moral wrong are coextensive. *Id.* at 248, 979 A.2d 312. Thus, in the three cases in which it has considered the "deific command" issue—*Worlock, Winder,* and the present case—the Court has never concluded that a defendant is entitled to a deific command charge.

Given this history, I respectfully submit that the deific command concept has a tenuous connection to New Jersey law. Special consideration for defendants relying on a deific command theory is not, in my view, compelled by the Legislature's use of the term "wrong" in *N.J.S.A.* 2C:4–1, which codifies *M'Naghten* but makes no reference to the notion of a defendant's inability to perceive "moral wrong." The concept was not introduced to our law by the circumstances of an actual case involving a deific delusion. Instead, in both New York and New Jersey, it originated as nothing more than a hypothetical illustration of a setting in which a defendant could perceive an act as legally but not morally wrong. *Schmidt, supra,* 110 *N.E.* at 949; *Worlock, supra,* 117 *N.J.* at 608–

09, 569 A.2d 1314. Its limits were further underscored by the Court in *Winder, supra,* 200 *N.J.* at 248, 979 *A.*2d 312.

The jury instruction formulated by the Appellate Division panel below—to be given in a retrial of defendant—would direct the jury to find defendant not guilty by reason of insanity if he proved by a preponderance of the evidence that he acted pursuant to a delusion of receiving a deific command, or " 'where a delusional command could be objectively recognized to confound the difference between lawful behavior and a moral imperative.' " *State v. Singleton,* 418 *N.J.Super.* 177, 204, 12 *A.*3d 728 (App.Div.2011) (quoting *Winder, supra,* 200 *N.J.* at 251, 979 *A.*2d 312). The Appellate Division's proposed jury instruction demonstrates the hazards of the deific command concept. The instruction could be construed to suggest that a defendant's invocation of a deific command presumptively resolves what should be a fact-sensitive, dispassionate inquiry into the psychiatric condition of a criminal defendant. It poses the real danger of confusing and distracting a jury, and could reward the defendant who fabricates an account of visions, voices and divine commands. In my opinion, the insanity defense should be reserved for a defendant whose psychiatric condition renders him or her unable to appreciate the illegality of the crime at issue, and the deific command theory should be jettisoned.

I fully subscribe to the majority's observations about the principle of stare decisis; it is an important foundation of our legal system, " 'to which we adhere for the sake of certainty and stability.' " *Ante* at 180, 48 *A.*3d at 298 (quoting *State v. Shannon,* 210 *N.J.* 225, 226, 43 *A.*3d 1146 (2012)). However, I consider this case to present the unusual setting in which the principle of stare decisis does not compel the Court to precisely conform its holding to prior decisions.

Given the factual setting of *Worlock,* its discussion of the deific command is dicta. In *Winder,* the Court also declined to apply the deific command theory to the defendant in that case. *Winder, supra,* 200 *N.J.* at 250–51, 979 *A.*2d 312. As a result, the

discussions are authoritative even though they were not essential to the disposition of either case. *See State v. Rose*, 206 *N.J.* 141, 182–84, 19 *A.*3d 985 (2011).

But even if we were to treat the dicta in *Worlock* and *Winder* as though they had the full weight of precedent, there are still "special justifications" that would warrant overturning the deific command construct. *Luchejko v. City of Hoboken*, 207 *N.J.* 191, 209, 23 *A.*3d 912 (2011). Such justifications include "when a rule creates unworkable distinctions [or] when a standard defies consistent application by lower courts," *ibid.*, or when " 'conditions change and as past errors become apparent,' " *White v. Twp. of N. Bergen*, 77 *N.J.* 538, 551, 391 *A.*2d 911 (1978) (quoting *Fox v. Snow*, 6 *N.J.* 12, 27, 76 *A.*2d 877 (1950) (Vanderbilt, C.J., dissenting)). In my opinion, that standard is easily met here. The deific command concept is not required by the text of the statute or its legislative history. Our Court has not once held that the facts before it have entitled a defendant to an expanded jury instruction based on this theory. Such an instruction has the tendency to mislead and confuse jurors, and raises the specter of rewarding the fabrication of deific delusions. Its arguable utility is therefore offset by its potential to lead to inequitable results.

The majority characterizes this case as one in which the judiciary may rely on legislative correction, and finds the deific command concept to be fortified by the Legislature's failure over the years to nullify it by statute. *Ante* at 180–81, 48 *A.*3d at 298–99 (citing *White, supra,* 77 *N.J.* at 556, 391 *A.*2d 911). In this regard, I must part company with the majority. As we have held, "[t]he Legislature need not explicitly amend a statute ... every time [a court] takes action inconsistent with it in order to avoid the implication that the Legislature concurs." *State v. Cannon*, 128 *N.J.* 546, 566–67, 608 *A.*2d 341 (1992). The Court has noted in other contexts that "[l]egislative inaction has been called a 'weak reed upon which to lean' and a 'poor beacon to follow' in construing a statute." *GE Solid State, Inc. v. Dir., Div. of Taxation*, 132 *N.J.* 298, 313, 625 *A.*2d 468 (1993) (citations omitted); *see also*

*Amerada Hess Corp. v. Dir., Div. of Taxation,* 107 *N.J.* 307, 322, 526 *A.*2d 1029 (1987), *aff'd,* 490 *U.S.* 66, 109 *S.Ct.* 1617, 104 *L.Ed.*2d 58 (1989).

Here, the Legislature enacted *N.J.S.A.* 2C:4–1 before this Court construed the simple word "wrong" to permit an insanity defense based on deific command delusions, whether in dicta or in any holding. I cannot presume that the Legislature's failure to address this specific issue, given its many priorities, amounts to an endorsement of the deific command. In my view, the inclusion of a deific command notion as part of *N.J.S.A.* 2C:4–1 is the creation of our case law. The principles of stare decisis do not require that we apply it now or in the future.

Except as noted above, I join in the majority's decision to reverse the determination of the Appellate Division panel and remand to the Appellate Division for consideration of defendant's remaining arguments.

Justice HOENS, dissenting.

A man, having given himself over to the study of religious texts and tracts, believes that he is called by God to carry out various acts that no sane man would perform. His family grows fearful of his numerous expressions of what he believes he has been called to do in order to cleanse the world of them or to cleanse them of their sins. Some of his pronouncements include expressions that he is resisting God's orders; others make it plain that he is intent on complying with God's will as he understands it, even to the point of putting others to death.

His family first tries to use the powers of reason in an effort to convince him that his views do not comport with traditional religious teachings and in order to convince him of the errors in his increasingly bizarre and frightening pronouncements. Failing that, they essentially force him from their home. He moves in with a woman who then becomes pregnant with his child. Believing that she is nothing more than a harlot in the eyes of God and that she is in need of cleansing, he kills her. In the aftermath of

that horrific act, his behavior includes some actions that appear to be consistent with efforts to elude detection and some lucid statements, but his family members report that he is babbling, obviously talking to and hearing the voice of someone they can neither see nor hear.

By the time of his trial, the explanations he has given about his behavior to the mental health professionals include both assertions that he was acting in accordance with what he believed to be the will of God and expressions of remorse that he now recognizes that he was duped by the devil into doing things contrary to the will of God. Nonetheless, his own testimony at trial explained that sometimes he heard directives and sometimes the "Spirit ministered to me and that I received like—a talk from Him" and that killing his girlfriend "was the right thing because it was something God was telling me to do." Expert testimony included the opinion that defendant killed his girlfriend because he "believed that he was being compelled to do this by God and that therefore he had to obey that belief."

No one disputes that defendant Boyce Singleton is mentally ill. The question before the Court today is whether the factual setting in which he acted and the expert testimony concerning his mental status is sufficient to meet the test that we have devised for the deific command variation on the traditional insanity defense. *See State v. Winder*, 200 *N.J.* 231, 246–48, 979 *A*.2d 312 (2009) (considering difference between deific command and personal moral code); *State v. Worlock*, 117 *N.J.* 596, 611, 569 *A*.2d 1314 (1990) (recognizing deific command variation on insanity defense). More to the point, the question before this Court is whether, in light of that record, the trial court's failure to charge the jury in accordance with *Worlock* was an error that entitles defendant to a new trial. The Appellate Division concluded that it was, as do I. Therefore, I respectfully dissent.

I.

We have long recognized that "clear and correct jury instructions are fundamental to a fair trial." *State v. Adams*, 194 *N.J.*

186, 207, 943 *A*.2d 851 (2008). In the context of a criminal trial in particular, we have cautioned that erroneous jury charges presumptively constitute reversible error, *State v. Jordan,* 147 *N.J.* 409, 422, 688 *A*.2d 97 (1997), and are "poor candidates for rehabilitation under the harmless error philosophy," *State v. Vick,* 117 *N.J.* 288, 289, 566 *A*.2d 531 (1989) (citation omitted). Those expressions of our deeply held concern for ensuring that all defendants are accorded a fair trial are no more compelling than they are in the case of one facing a charge of murder.

To be sure, we have fixed different standards against which to test such errors based upon whether a defendant requested a charge or failed to do so. In the latter circumstance, we have established a stringent standard, one that requires the defendant to demonstrate that the failure to include the charge was plain error and therefore clearly capable of producing an unjust result. *R.* 2:10–2; *see State v. Burns,* 192 *N.J.* 312, 341, 929 *A*.2d 1041 (2007). Although the plain error standard is an exacting one, the record in this case, fairly and objectively viewed, surely meets it.

Indeed, it is only by redefining the meaning of *Worlock's* deific command variation on the insanity defense, by imposing a new and exceedingly narrow view of the type of command that will qualify for that defense, by altering our previously-accepted notion of the difference between a true deific command and acts based on a personal moral code, and by ignoring the abundant evidence adduced at trial through fact and expert testimony in support of the conclusion that defendant fit within the traditional bounds of the deific command defense, that the majority can conclude that the failure to give the charge sua sponte did not amount to reversible error. In adopting this approach, the majority has created a test so narrow as to be essentially non-existent. It is, therefore, a new test that stands in clear disregard of the statutory definition of insanity, that is contrary to our previous decisions explaining the sources from which that statute was drawn and that is at odds with both religious practices and psychiatry.

Whether a jury would find that defendant met the definition of insanity had they been correctly charged we cannot know; that defendant has been deprived of the chance to be judged fairly in accordance with the statutory commands that define insanity in terms of both legal and moral wrong is the essence of injustice.

## II.

The essential reasons for my disagreement with the majority's reasoning and conclusion can be explained succinctly. First, the majority fails to recognize that the issue presented in *Worlock*, as to which the deific command discussion was but a small component, was nothing less than this Court's clear articulation of the fundamental basis upon which we, and our Legislature, have embraced a definition of insanity that includes both legal and moral wrong. *Worlock, supra*, 117 *N.J.* at 606, 569 *A.*2d 1314 (describing issue as one of first impression). It was there that this Court traced the concept back to its roots in *M'Naghten, see id.* at 603–07, 569 *A.*2d 1314, there that the Court described the evolution of the concept here and around the country, *id.* at 608–09, 569 *A.*2d 1314, and there that this Court adopted Judge Cardozo's reasoning that serves as the essential underpinning of our now well-established recognition of the deific command defense, *ibid.* (quoting *People v. Schmidt*, 216 *N.Y.* 324, 110 *N.E.* 945, 949 (1915)). To dismiss that scholarly explanation on such an important subject as a "narrow caveat," *ante* at 160, 48 *A.*3d at 286, suggests that the majority deems both this Court's decision in *Worlock* and the entire notion of the deific command defense to be unworthy of our attention.

Second, the majority overemphasizes the confined focus that this Court had in the more recent *Winder* decision, implying that *Winder* forged new ground. In fact, this Court in *Winder* merely recognized that a defendant who acts based on a personal moral code cannot claim the benefit of the deific command defense that we authorized in *Worlock*. The defendant in *Winder* made little effort to suggest that he acted pursuant to a deific command.

Rather, his defense was that there were "other delusion-based exceptions" that *Worlock* suggested might be available and for which he qualified. *Winder, supra,* 200 *N.J.* at 249, 979 *A.*2d 312. Although the Court referred to the deific command defense as a narrow one, the Court did so in the context of a refusal to expand it to one who failed to demonstrate that the delusion he identified could or did fall into the category of legal but not moral wrong. *Id.* at 249–50, 979 *A.*2d 312. Nothing in that decision suggests, as the majority today prefers, that the true deific command has lost any of its vitality as a variant of the insanity defense.

Third, the majority's analysis of the record today alters the distinction we recognized and applied both in *Winder* and in *Worlock* between defendants who respond to true deific commands and those whose criminal acts are instead motivated by adherence to a personal moral code. The defendant in *Worlock* believed that he was permitted to kill his victims because "they're the folly-ridden mass, they're controlled by their popular beliefs" and because he lived by the code of "might makes right," not because he was responding to any deific directive. *Worlock, supra,* 117 *N.J.* at 614, 569 *A.*2d 1314. The defendant in *Winder* contended that he feared his parents were planning to kill him and murdered an innocent cab driver in order to be sent to prison where he would be safe from them. *Winder, supra,* 200 *N.J.* at 236–39, 979 *A.*2d 312. That logic, too, had all of the hallmarks of a purely personal code of conduct and none of the criteria by which a deific command can be identified. It was in that context that we cited precedents of our own, *see id.* at 247–48, 979 *A.*2d 312 (citing *State v. DiPaolo,* 34 *N.J.* 279, 293, 168 *A.*2d 401 (1961)), as well as the leading authority from another jurisdiction, *id.* at 247 n. 6, 979 *A.*2d 312 (discussing *State v. Crenshaw,* 98 *Wash.*2d 789, 659 *P.*2d 488, 494–95 (1983)), that demonstrate that a belief system that is contrary to societal mores is not sufficient.

This accepted distinction between deific commands and personal moral codes is best illustrated by the decision of the Supreme Court of Washington. *See Crenshaw, supra,* 659 *P.*2d at 494–95.

There, the defendant acted in conformance with his Muscovite beliefs which, he contended, obligated him to kill his wife for her infidelity. Rejecting his assertion that he was entitled to claim the "sanctuary of the insanity defense," the court held that "some notion or morality, unrelated to a mental illness, which disagrees with the law and mores of our society is not an insane delusion." *Id.* at 495. Such a set of beliefs would no more be insane and would no more be a defense than the man who, coming from a culture where women are property and beating them is the accepted norm, claimed entitlement to walk free from the crime of assault if he beat his wife here. *See S.D. v. M.J.R.,* 415 *N.J.Super.* 417, 431–33, 2 *A.*3d 412 (App.Div.2010) (rejecting contention that asserted religious beliefs about husband's marital rights negated ability to form criminal intent); *see also Reynolds v. United States,* 98 *U.S.* 145, 166, 25 *L.Ed.* 244, 250 (1879) (concluding that First Amendment's guarantee of freedom of religion did not shield defendant from polygamy conviction).

The reliance on a moral code that is on its face rational but unacceptable to our legal system is not a form of insanity. But that is not what deific commands are all about. The reason that the deific command qualifies as a defense to murder is that it is the one corner of insanity in which legal and moral wrong do not coincide. *See Worlock, supra,* 117 *N.J.* at 610–11, 569 *A.*2d 1314. One who acts in accordance with a sincerely held belief that he has been directed by God to carry out a murder may well appreciate that the crime is legally wrong, but will nonetheless act on the directive because he equally believes that it is a moral imperative. And it is only by recognizing the deific command that we, as a Court, can give full meaning and content to the Legislature's statutory definition of insanity. *N.J.S.A.* 2C:4–1. That body chose the word "wrong" rather than the word "illegal" in defining the insanity defense; it made that choice against the backdrop of the decades, in fact more than a century, of precedent extending back to the *M'Naghten* formulation of the distinction between legal and moral wrong. This Court is not free to abandon that distinction through today's crabbed interpretation.

Fourth, the majority redefines *Worlock* and *Winder* to suit the current purpose. It does so by altering the meaning of deific command so that it means one thing and one thing only, namely a direct, apparently verbally transmitted, command from God to do a specific act that the defendant then cannot help himself from carrying out. That view of deific command, however, finds no real support in any of this Court's prior cases, nor in the precedents on which they were based. The majority's decision expresses a new and rigid view of just what sort of a command from God it now believes is needed to so blur the line between legal and moral wrong as to call for the *Worlock* charge. Apparently only a booming voice from heaven, presumably admitting of only a singular direction, will meet the test for deific command. That constricted version of the test serves only to substitute as part of the fabric of our law an exceedingly narrow view of religious traditions found only in the cinema.

More troubling to me, that articulation of the sort of command that the majority now finds will define the *Worlock* variant on the insanity defense is sadly lacking in an understanding of either religion or psychiatry. While I do not profess to be expert in either, there is abundant support for the proposition that deific commands come in many forms and that courts do not reject the defense based on the manner in which the instruction has been purportedly received or revealed. *See, e.g., People v. Coddington,* 23 *Cal.*4th 529, 97 *Cal.Rptr.*2d 528, 2 *P.*3d 1081, 1111 (2000) (permitting insanity defense for defendant who believed, among other things, that God communicated to him through traffic signals and numbers), *overruled in part on other grounds, Price v. Superior Court,* 25 *Cal.*4th 1046, 108 *Cal.Rptr.*2d 409, 25 *P.*3d 618, 633 n. 13 (2001); *State v. Blair,* 143 *N.H.* 669, 732 *A.*2d 448, 449 (1999) (permitting insanity defense based on defendant's contention that God appeared while he was in "trance"); *State v. Lafferty,* 20 *P.*3d 342, 363 (Utah 2001) (permitting insanity defense for Mormon fundamentalist who killed his sister-in-law and her infant child based on God's "removal revelation").

The majority's suggestion that henceforth only a very specific variation of a command from God will suffice also ignores the fact that entirely sane people of faith profess to receive directions from God in ways far different from the cinematic version of how God speaks. They see visions, they find directions in dreams, they feel called, they express their knowledge of the will of God in myriad different ways. By extension, why would an insane person who believes he is directed by God to do something we would all say is illegal not similarly profess to have received that command in one of these other, entirely traditional manners?

Indeed, if we accept, as the majority apparently does, that for an insane person, there is but one version of a deific command and that it takes the sole form of an audible voice directing an immediate action, we are resurrecting, without perhaps intending to do so, the irresistible impulse approach to insanity that we long ago discarded. *See State v. Cordasco*, 2 *N.J.* 189, 196, 66 *A.*2d 27 (1949) (adhering to *M'Naghten* rule and rejecting irresistible impulse formulation of insanity); *Mackin v. State*, 59 *N.J.L.* 495, 496–97, 36 *A.* 1040 (E. & A.1896) (same). This is so not because of the requirement that it be a voice, but because the majority has coupled that requirement with notions about commands, orders, and "do this now" language as to which the recipient cannot but comply. I see no basis for such a remarkable alteration in the law that governs the insanity defense.

Nor does the majority's opinion remain faithful to the psychiatrists' view of what might qualify as a delusional deific command. The experts in this case did not quarrel over whether the form in which defendant said he had received his instructions from God would suffice, they in fact agreed that defendant suffered from delusions that caused him to believe he had been called in some way by God. What they disputed was whether it was a call to commit this murder or whether the murder was instead triggered by defendant's history of aggressions against women, his strained and troubled relationship with the victim, or the victim's refusal to turn over the car keys when he asked for them. For the majority

to substitute its newfound belief that God only speaks in one way, or more precisely, that we will only recognize that an insane person hears the instruction from God or the call of God in a single format, is a dramatic and unsupported departure indeed.

Fifth, the majority, rather than reviewing the evidence in the record in accordance with our usual principles concerning the review on appeal of whether there is enough evidence in the record to require that the jury be charged sua sponte, proceeds instead to draw its own conclusions about the result it would have reached about whether defendant was insane. We have held that the trial court is obliged to charge a jury sua sponte "only when the evidence clearly indicates the appropriateness of such a charge[.]" *State v. Walker*, 203 *N.J.* 73, 87, 999 *A.*2d 450 (2010) (considering court's obligation to charge statutory defense to felony murder without request); *see State v. Rivera*, 205 *N.J.* 472, 488–90, 16 *A.*3d 352 (2011) (applying same standard to evaluate court's obligation to charge any defense sua sponte); *State v. Denofa*, 187 *N.J.* 24, 41, 898 *A.*2d 523 (2006) (applying same standard in considering requirement to charge lesser-included offenses).

Utilizing our well-established test, the question is whether the evidence in the record "clearly indicates the appropriateness" of the *Worlock* charge. Tested in accordance with that standard, rather than tested in accordance with the majority's approach of viewing the evidence through the lens of its new definition of the contours of the deific command variation of insanity, one can only conclude that the substantial evidence concerning defendant's behavior, beliefs and rationale sufficed.

That there is evidence suggesting that defendant was not insane, or did not act in accordance with a deific command is not the point; rather, the existence of such evidence and the manner in which it should have been weighed and balanced is the proper function of a jury and not of this Court. The fundamental error of the majority's analysis is that it tries to make rational sense out of what in the end is clear evidence of a disordered and delusional

mind. Mistaking a few glimmers of lucidity or perhaps some sane behaviors for an organized thought process, the majority finds so little evidence of the deific command that it deprives defendant of the defense entirely. In doing so, it inappropriately substitutes its view for that of the finder of fact.

### III.

In the end, I dissent because the majority has adopted a crabbed view of *Worlock,* has announced a view of *Winder* not expressed by the majority of the Court who joined it, and has retreated to an indefensible understanding of concepts of insanity and deific commands. I therefore respectfully dissent.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, PATTERSON and Judge WEFING (temporarily assigned)—4.

*For dissent*—Justices ALBIN and HOENS—2.